SUSSMAN & ASSOCIATES
1 RAILROAD AVENUE, SUITE 3
GOSHEN, NEW YORK 10924
(845)-294-3991


UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

KAREN AND ANDREW DALE, on behalf

of C.D., their natural and minor son,

        Plaintiffs,                              **COMPLAINT**

vs.

SUFFERN CENTRAL SCHOOL DISTRICT,

        Defendants.

----------------------------------------------------------------x

## INTRODUCTION

1.  Plaintiff's son, CD, was bullied and harassed by other students and teachers in the Suffern Central School District between the 2015-16 through 2017-18 school years.

2.  This bullying was on account of CD's disability, often focusing on his being "blind" or his problems with balance and dexterity.

3.  Plaintiffs and CD reported this bullying to teachers and administrators.

4.  Defendant's agents manifested deliberate indifference and failed to effectually respond to the bullying or take effective steps a safe educational environment for CD.

5.  CD became increasingly despondent as a consequence of this bullying and the district's failure to provide him a safe learning environment.

6.  As a direct consequence of the bullying, plaintiffs hospitalized CD in October 2017 and removed him from school for several weeks.

## PARTIES

7.  Plaintiffs, Karen and Andrew Dale, are the natural parents of CD, an eleven year old who suffers from documented disabilities.  They reside within the Suffern Central School District.

8.  Defendant Suffern Central School District is a municipal corporation organized pursuant to the laws of the State of New York.  It operates within the County of Rockland and may sue and be sued for the negligent conduct of its agents and for the deliberate failure of its officers and managers to provide CD a school environment safe from bullying by other students and adults.

**JURISDICTION**

9.  On or about January 2, 2018, Plaintiffs filed and served upon the Clerk for defendant school district a notice of claim regarding the defendant's failure to respond to the pattern of bullying to which their minor son had been subjected. See, Exhibit 1.  Said Notice of Claim related to the continuing pattern of bullying and unresponsiveness by defendant through its agents, employees and assigns.

10.  As section 504 of the Rehabilitation Act of 1973 prohibits discrimination on the basis of disability by recipients of federal funds and as defendant district does receive such funds, this Honorable Court has jurisdiction over this matter pursuant to 28 U.S.C. secs. 1331 and 1343 (1) & (2). This Honorable Court has jurisdiction over plaintiffs' pendent state law claim pursuant to 28 U.S.C. section 1367(a).

**AS AND FOR A FIRST CAUSE OF ACTION – DELIBERATE INDIFFERENCE  - DISABILITY DISCRIMINATION**

11.  CD is now eleven years of age.

2

12. CD has been enrolled since kindergarten in the defendant school district.

13. At all times relevant hereto, CD suffered from disabilities as defined by federal and state law.

14. Such disabilities include, but are not limited, to a severe neuro-developmental disorder manifested by sensory processing and motor coordination deficits which limit significantly his ability to engage in sensory processing and impedes his motor coordination

15. CD also suffers from diagnosed anxiety and PTSD.

16. CD is also legally blind in his left eye and suffers from amblyopia.

17. CD suffers from severe allergies and asthma.

18. The bullying which CD experienced often focused on and was triggered by his disabilities, attendant deficits and behaviors associated therewith.

19. Plaintiffs advised school authorities that their son was being subjected to bullying occasioned by his disabilities.

20. As is set forth in greater detail below, defendant's agents responded in a deliberately indifferent, failing to discipline teachers who bullied CD or to ensure that each teacher who dealt with CD knew of, and was reasonably sensitive to, his disabilities and failing to discipline offending students or, more generally, to

3

provide students with guidance as to how to respond to other students with disabilities.

21.  While plaintiffs requested that all CD's teachers be informed of his disabilities and their effects and that students be given general guidance on how to treat others with disabilities, the district refused and failed to comply with these requests.

22.  Instead, despite being advised that much of the bullying to which CD was subjected related to his deficits in vision and balance, school authorities did nothing to sensitize other students to the need to accept CD and treat him in a humane manner.

23.  Such conduct substantially contributed to the hostile educational environment to which DC was continuously subjected during the 2015-16 through 17-18 school years.

24.  By failing to recognize that the bullying to which CD was being subjected was caused, in large part, by others' responses to CD's disabilities and then to take actions to remedy this conduct, the district exhibited deliberate indifference and subjected CD to a hostile educational environment and caused a substantial decline in CD's emotional well-being.

25.  During the 2015-16 school year, CD was a third grader at the R.P. Connor Elementary School.

26.  During that school year, various other students enrolled in the same school  teased and bullied CD.

27.  These students made fun of CD's balance, his appearance and often excluded him from activities during recess.

28.  In taunting CD, these students often referenced CD's disabilities

29.  As it occurred, CD himself reported this bullying to his teacher and his parents.

30.  However, the bullying did not abate.

31. In May 2016, plaintiff Karen Dale reported the bullying to the school principal.

32.  On June 14, 2016, CD lost his balance and fell off a chair while in art class.

33.  His art teacher, Mr. Pashley, told him to "stop acting like a jerk."

34.  Following this and during the last week of school, other children teased CD about this incident and particularly found highly amusing the fact that one of

their teachers had told CD to stop acting like a jerk, an action which confirmed and condoned their year-long bullying of CD.

35.  Plaintiffs reported the teacher's conduct to school principal, DiPersio, who addressed the matter with the teacher and CD's peers.

36.  However, none of the offending students were disciplined in any manner during the 2015-16 school year.

37.  Despite the principal's response, bullying against CD continued through the balance of the school year.

38.  On or about September 1, 2016, plaintiff Karen Dale met with the new principal of Connor Elementary school, Kelly Dowd.

39.  Plaintiff Karen Dale told the new principal that CD had been grouped in a fourth-grade classroom with children who had bullied her son during the prior school year.

40.  In late September, a female student, G, who had previously bullied CD, began behaving in the same manner, attempting to boss CD around and demean him.

41.  Plaintiff Karen Dale discussed this pattern of behavior with her son's teacher and advised of the prior history of bullying by this student against her son.

42. In December 2016, plaintiffs reported that their son was extremely nervous and ill at ease because his peers were teasing him and calling him names at school.

43. Plaintiffs further reported that CD expressed fear of being embarrassed and taunted and was averse to attending school.

44. On January 19, 2017, Pashley, who remained CD's art teacher, again started yelling at CD in class and, in tears, CD complained to his parents that this teacher was targeting him.

45. Right after this incident, another student, J, told CD that all the other kids would hate him if he reported that Pashley had yelled at him and if he got Pashley fired.

46. J then falsely reported to his parents that CD had pushed him into a coat rack.

47. CD denied doing this, but principal Dowd believed J.

48. Dowd provided no reports or emails about this incident to CD's parents, as is custom and practice where such an incident occurs.

49. Following the second incident with Pashley, between January 27-31, CD did not want to attend art class.

50.  Plaintiffs enlisted the assistance of CD's classroom teacher who, they felt, might be able to make their son more comfortable going to Art class.

51.  The school principal, Dowd, expressed anger that plaintiffs had asked for the assistance of his teacher and claimed that this teacher provoked CD's anxiety.

52.  On January 31, 2017, while in the cafeteria, another student, J, pushed CD into a table.

53.  Though apprised of the situation, Dowd did not advise plaintiffs of this incident.

54.  Instead, she told CD that he was in the middle of a lot of stuff going on in class and that his teachers were having problems controlling his class.

55.  On February 3, 2017, CD could not go to school due to anxiety and reported to his parents that other students were teasing him.

56.  Plaintiff Karen Dale called the school nurse and explained her son's status.

57.  On February 7, 2017, Dr. Lawrence Rosen, who had diagnosed CD with a severe neuro-developmental disordered manifested by sensory processing and motor coordination difficulties the prior month, recommended to the district's child

study team that the school designate a safe space for CD to go when he gets overwhelmed.

58.  On February 22, 2017, at a 504 meeting attended by numerous staff members, plaintiffs reported that CD was getting teased a great deal in school, especially at recess, and expressing significant anxiety about school attendance.

59.  Dr. Rosen, CD's doctor, also noted that CD was manifesting PTSD-like symptoms and was emotionally affected by the persistent bullying.

60.  On February 27, 2017, the plaintiffs emailed Dr. Garrison, the school psychologist, explaining the changes in their son's behavior, particularly his school aversion and his emotional outbursts.

61.  Dr. Garrison told plaintiffs she would speak with school principal Dowd and get back with them.

62.  On March 7, 2017, CD's classroom teacher called plaintiffs and advised that CD felt targeted by other students and that trying to ignore these students would not resolve the issues.

63.  In early March 2017, CD's classroom teacher addressed the students about  recommendations for students to serve as "Safety Patrol" officers.

64.  Two students who had previously bulled CD, G and J, repeatedly told him that, if they were selected as Safety Patrol Officers, they would write him up and could not wait to get him in trouble.

65.  Plaintiffs reported these conversations to CD's classroom teacher who was recommending students from his classroom as Safety Patrol Officers.

66.  On March 13, 2017, plaintiffs reported to Dr. Garrison that CD felt increasingly unsafe at school due to the threats G and J made toward him.

67.  Plaintiffs advised their son to keep to himself, hoping this would cause his peers to back off of him.

68.  This coping strategy did not succeed; instead, later in March 2017, as members of the newly selected Safety Patrol, G and J repeatedly accused CD of doing things he did not so and continued to threaten to get him in trouble.

69.  On April 6, 2017, plaintiffs met with CD's classroom teacher and Dr. Garrison and reported that other, identified students were making fun of their son for wearing glasses and for falling [as he often did, particularly when anxious]. They also reported that other children repeatedly told CD that nobody likes him and that he was left out of games during recess.

70.  On April 20, 2017, CD's classroom teacher called plaintiffs and reported that he and CD had a conversation during which CD stated that he did not like to be called "rude" and "disrespectful" all the time and that he saw two students, J and G, high-fiving each other after CD got in trouble for not speaking with them.

71.  On April 21, a classmate told CD that he would grow up to be a murderer.

72.  The same day, during recess, G and J were taunting CD for "losing" a game; this prompted CD to leave the game and to go to his "crying spot".

73.  While the classroom teacher reprimanded students for taunting CD, they were not otherwise sanctioned or punished though they frequently behaved like this toward CD.

74.  As of late April 2017, CD's 504 plan contemplated him taking breaks when upset.

75. On April 25, 2017, CD's classroom teacher advised plaintiffs that CD was taking such breaks.

76.  On April 25, 2017, J again taunted CD, advising the other students on how to get CD "in trouble."

77.  The same day, J falsely accused CD of kicking him and his parents complained to the building principal Dowd about this.

78.  Dowd never notified plaintiffs about this allegation.

79.  On April 27, following his claim that CD was "insubordinate, obnoxious, rude and not acting properly in class," a gym teacher, McNally, made CD eat lunch from the gym floor.

80.  When CD started having an asthma attack, this teacher refused to allow him to get and use an inhaler, claiming he was faking.

81.  On the contrary, CD had a full-blown panic attack and an asthma attack.

82.  Finally, CD was permitted to access the school nurse who called plaintiffs and indicated she could not calm down their son.

83.  The following day, plaintiff Andrew Dale met with the gym teacher who professed ignorance of CD's 504 plan, his history of anxiety and the bullying to which he was subjected by other students.

84.  The gym teacher considered CD "rude" and "obnoxious" for avoiding bullying conduct which plaintiffs had instructed CD to ignore.

85.  On April 28, 2017, during a second meeting, principal Dowd proposed three alternatives for CD: he could do "specials," like gym with another class; she

could assign an aid for specials and recess or CD could be assigned to another fourth- grade class.

86.  During the meeting, principal Dowd acknowledged that CD had a positive relationship with his classroom teacher and that plaintiffs likely would not want to disrupt that.

87.  During the meeting, principal Dowd reported that J's father [who she knew] complained that CD was not receptive to his son.

88.  On May 1, 2017, Dowd advised plaintiffs that rather than await their feedback on how to address bullying, she unilaterally decided to place an aide in CD's class.

89.  Dowd acted because J's father claimed that CD was bullying his son.

90.  On May 2, plaintiffs learned from CD's classroom teacher that their son had a "crying spot" at recess.

91.  During recess, rather than relate to the other students, CD would walk to his crying spot and stay there.

92.  The new aide would hover over CD.

93.  Having been told that the aide was not brought to the class to focus on CD, plaintiff Andrew Dale advised Dowd that this is precisely what was happening

13

and that he had learned that Dowd had told other parents she was bringing in an aide to help with CD.

94. With this information and concerned that this way of dealing with bullying aimed at his son would only send the wrong message – that CD was the problem – plaintiffs contacted and sought to meet with the school superintendent, Dr. Douglas Adams about the ongoing bullying to which his son was being subjected.

95. On May 4-5, 2017, the Superintendent reported that he was too busy to meet with plaintiffs.

96. On May 10, 2017, J told CD that the aide was in class because of CD.

97. On or about May 15, 2017, plaintiffs sought to meet with the deputy superintendent, Stephen Walker.

98. They wished to express concern that other students in their son's class were taunting him for needing an aide and that he was again increasingly anxious and school averse.

99. Walker re-directed plaintiffs to the 504 committee and refused to meet with them.

100. Plaintiffs continued to reach out to Walker without success.

101.  On May 18-19, CD came home crying that the classroom teacher was yelling at him, embarrassing him in front of other students.

102.  The following day, a new vision therapist entered CD's classroom, but CD reacted anxiously, concerned that this visit, too, would provoke taunting.

103.  Upset, CD went to the nurse's office and was sent home.

104.  The last week in May 2017, CD expressed anxiety to his classroom teacher, explaining that the aide was hovering near him, prompting other students to make fun of him.

105.  During the first week of June 2017, CD reported continued harassment in gym and continued false accusations by J and G, members of the Safety Patrol.

106.  CD protested these false accusations, but adults in the building, specifically his aide and the gym teacher, sided with the other children.

107.  On June 7, 2017, plaintiffs went to central office and tried to submit FOIL requests regarding Dowd.

108.  Apprised of the request, Walker, who was then in an intimate personal relationship with Dowd, declined to accept them.

109.  Plaintiffs stepped out of the building to receive a phone call.

110.   Upon its completion, Walker barred plaintiffs from re-entering the administration building.

111.   Staff advised plaintiffs that they could not enter the building without an appointment.

112.   This barment directive contravened state open buildings law.

113.   On June 8, 2017, during school, another student, J, kicked CD hard enough to open an old wound and cause bleeding.

114.   Dowd learned of the taunting and the kick.

115.   Plaintiffs asked to meet with the principal to discuss the escalating harassment to which other students were subjecting their son.

116.   She declined but sent plaintiffs a DASA form to fill out.

117.   In fact, apprised of the bullying of CD, school authorities like principal Dowd were responsible for filling out such forms, but repeatedly failed to do so.

118.   School authorities routinely failed to complete or submit such reports though the bullying directed at CD should have caused their preparation and filing.

119.   On June 9, 2017, Dowd refused to meet with plaintiffs until they completed the DASA form.

120.  On June 12, 2017, plaintiffs advised school board members that they were being marginalized and could not get access to high-ranking school administrators to discuss the bullying and harassment their son was experiencing

121.  On July 18, 2017, Dowd and 504 supervisor Rivera met with plaintiffs.

122.  Plaintiffs expressed concern that assignment of the aide further stigmatized their son; Dowd admitted that most staff in the school thought the aide was in CD's classroom for CD and she did nothing to disabuse any of that conclusion.

123.  On July 27, 2017, plaintiffs reported to Dowd that CD was refusing to wear needed eye glasses for fear of being taunted.

124.  On August 9, 2017, at the Suffern pool, G's younger brother, T, told CD that all the kids knew he was trying to get the fourth-grade teacher fired.

125.  On August 30, 2017, an attorney, Rachel Asher, wrote the district on plaintiffs' behalf, noting that CD been subjected to ongoing bullying with statements like: he had no brain, he was blind as a bat, nobody likes him, he fell down because he wanted attention, he looked like a drugged Mickey Mouse, he was someone who nobody believed.

126.  On September 6, 2017, Dowd reported to plaintiffs that CD was being bullied on the playground, that he had missed sixty minutes of instruction because of his anxiety and that this raised issues with his readiness for middle school.

127.  Plaintiff Karen Dale asked principal Dowd how the school could assist her son.

128.  The principal refused to recognize CD's anxiety and provided no suggestions for ameliorating his situation.

129.  On September 18, 2017, two of CD's classmates told him to commit suicide and explained how he could do it, i.e., by jumping off a 50-foot tall bridge into shallow water.

130.  CD asked these students if they really wanted him to kill himself and they said "yes".

131.  Deeply upset, CD went to the nurse and called home.

132.  Plaintiff Karen Dale attended to the school and inquired whether the nurse would initiate a DASA report.

133.  The nurse advised that she had spoken with the principal who advised that such a comment was NOT bullying, just "excessive meanness."

134.  One of the two students who promoted suicide wrote CD an apology note, misspelling his name and noting that she was sorry for her "silly" behavior.

135. Defendant took no disciplinary action against the students who suggested that CD kill himself.

136.  On September 25, 2017, plaintiffs wrote the School Board advising that bullying continued and that CD was afraid to wear his eye glasses because of taunting.

137.  On the same day, a school nurse called plaintiff Karen Dale to report that CD had reported bullying at recess.  The nurse stated she could not deal with the situation.

138.  The same day, principal Dowd told plaintiffs that CD was not being bullied; that was only his perception and criticized his coping strategies.

139.  On September 27-28, CD left school due to bullying, which made him feel anxious.

140.  On October 2, 2017, a team meeting was held; members suggested that plaintiffs pull CD from school for three weeks and claimed that the bullying to which he had been subjected was his "perception."

141.  The following day, a school nurse reported that CD was not focused and had asked her if she hated him.

142.  On October 4, 2017, CD spoke with his fourth grade teacher and asked if he had to kill himself for people to believe how bad the bullying is.

143.  The teacher called plaintiffs, advised of CD's comments and noted his concern that CD appeared withdrawn and depressed.

144.  The same evening, plaintiffs observed CD staring blankly and very withdrawn and depressed.

145.  On October 6, 2017, after he began discussing ways in which he could kill himself, plaintiffs took their son to Valley Hospital.

146.  Staff at this hospital recommended placing CD in Four Winds, a psychiatric facility for adolescents, or High Point Day program.

147.  After consultation with CD's doctor, plaintiffs agreed to an intense outpatient placement for CD and so enrolled their son.

148.  During his absence from school, CD continued to report that he did not feel safe from bullying; plaintiffs sought a safety plan for CD from school authorities. .

149.  Plaintiffs appealed to the Superintendent and School Board to facilitate a meeting between them and CD's teachers to discuss a safety plan.

150.  On October 11, 2017, the Director of Pupil Personnel Services and principal Dowd indicated that they would set up a safety plan for him once they knew CD was returning to school.

151.  On October 20, 2017, plaintiffs sought to have their son transferred to another elementary school due to the toxic environment he faced at Connor.

152.  CD remained out of school until October 25, 2017 when he was finally transferred to another school, Cherry Lane.

152.  In transferring him, Dr. Adams rejected the plaintiffs' claim that CD had been subjected to a hostile learning environment.

153.  CD was emotionally distraught due to the bullying he experienced at school and during school hours, as set forth above.

154.  At all relevant times, defendant district was in substantial control of both its students and staff and was authorized to subject students and staff to appropriate rules and regulations and discipline upon their violation.

155.  At all relevant times, CD was subjected to severe and pervasive harassment based in substantial measure on his disabilities and associated characteristics beyond his control.

156.  At all relevant times, defendant district had actual knowledge that CD was being subjected to bullying and harassment based, in substantial part, on his disabilities.

157.  At all relevant times, school district personnel repeatedly either affirmatively contributed to this bullying, as through the comments and actions of the art and gym teachers and principal Dowd and deputy superintendent Walker, or failed to respond to the peer-on-peer bullying, thereby evincing intentional and deliberate indifference.

158.  As set forth above, defendant school district failed to act in a manner calculated to provide CD a safe school environment.

159.  By failing to provide plaintiff a learning setting free from pervasive bullying, defendant district deprived him of educational opportunity and caused CD great emotional distress on the basis of his disability and in violation of section 504 of the Rehabilitation Act of 1973.

## AS AND FOR A SECOND CAUSE OF ACTION – NEGLIGENT FAILURE TO SUPERVISE

160.  Plaintiffs incorporate paras. 1-159  as if fully set forth herein.

161.  During the 2016-17 school year, plaintiffs sought the intervention of Deputy Superintendent Walker because the principal of CD's school had been unresponsive to their reports of bullying and behaved in a manner partial to other students and their families.

162.  Specifically, the school principal repeatedly failed to complete or insure the completion of DASA forms chronicling the bullying to which CD was subjected in her school or to implement measures, including appropriate discipline of other students and staff, calculated to insure CD was provided a safe and bullying-free educational environment.

163.  Walker was repeatedly unresponsive to plaintiffs' requests for assistance and brushed them off.

164.  Walker so behaved because he was then having an intimate personal relationship with the very principal with respect to whom plaintiffs sought oversight and correction.

165.  Plaintiffs learned of, and raised, this conflict of interest with the school superintendent and school board, but neither took effective action to deal with this conflict of interest [as defined by the district's own policy] and assure redress for CD.

166.  By failing to properly supervise Dowd, defendant district acted in a negligent manner and refused and compounded her failure to implement the legal protections state and federal law provided for CD as a victim or bullying or assure CD an educational environment safe from pervasive bullying.

WHEREFORE, plaintiffs pray that this Court accept jurisdiction over this matter and award to plaintiffs [and on behalf of their minor son, CD] compensatory damages and the attorneys' fees, costs and disbursements associated with the prosecution of this matter and enter any other relief which the interests of justice and equity require.

Respectfully submitted,

MICHAEL H. SUSSMAN [3497]

SUSSMAN & ASSOCIATES
PO BOX 1005
1 RAILROAD AVENUE, SUITE 3
GOSHEN, NY 10924
(845)-294-3991

Counsel for Plaintiffs

24

Dated: May 16, 2018