UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

KAREN DALE and ANDREW DALE,
*on behalf of C.D., their natural and minor son*,

                       Plaintiffs,                        **DECISION AND ORDER**

        -against-                           18 Civ. 4432 (AEK)

SUFFERN CENTRAL SCHOOL DISTRICT,

                       Defendant.
------------------------------------------------------------x

**THE HONORABLE ANDREW E. KRAUSE, U.S.M.J.[1]**

      Plaintiffs Karen Dale and Andrew Dale bring this action on behalf of their minor son,

C.D., against Defendant Suffern Central School District (the "District"), asserting claims for

discrimination under Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794

*et seq.*, and negligent supervision pursuant to New York State law.  ECF No. 48 ("Am.

Compl.").  This action arises out of events that allegedly took place between 2015 and 2020,

when, according to Plaintiffs, C.D. was subjected to ongoing and pervasive bulling while a

student in the District.  Currently before the Court are Defendant's motions for summary

judgment and for spoliation sanctions.  ECF Nos. 76 (Notice of Motion), 80 (Memorandum of

Law or "Def.'s Mem.").  For the reasons that follow, Defendant's motion for summary judgment

---

[1] On November 12, 2019, the Honorable Vincent L. Briccetti endorsed and docketed a
fully executed Form AO 85, "Notice, Consent, and Reference of A Civil Action to A Magistrate
Judge," in which the parties consented to the reassignment of this matter to a United States
Magistrate Judge in accordance with 28 U.S.C. § 636(c).  ECF No. 43.  This matter was then
assigned to the Honorable Lisa Margaret Smith, and, on October 15, 2020, reassigned to the
undersigned.

is GRANTED IN PART AND DENIED IN PART and Defendant's motion for sanctions is GRANTED IN PART AND DENIED IN PART.

## BACKGROUND

The facts set forth in this section are undisputed unless otherwise noted and are taken from Defendant's Local Civil Rule 56.1 Statement of Undisputed Material Facts, ECF No. 81 ("Def.'s 56.1 Statement"), Plaintiffs' Response to Defendant's Rule 56.1 Statement, ECF No. 91 at 1-49 ("Pls.' 56.1 Resp."), Plaintiffs' Counterstatement of Material Facts, ECF No. 91 at 49-93 ("Pls.' 56.1 Statement"), and the supporting materials submitted by the parties.

### A.    The Parties' Submissions

As an initial matter, some discussion of the parties' supporting submissions is necessary. First, Plaintiffs' Counterstatement of Material Facts, to the extent it goes beyond responding to Defendant's 56.1 Statement and/or setting out allegedly disputed issues, is not authorized.  Local Civil Rule 56.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York permits only a counterstatement of "additional material facts as to which it is contended that there exists a genuine issue to be tried."  Local Civ. R. 56.1(b).  "There is no provision for a responsive 56.1 Statement to include additional facts that are not in dispute but that a party opposing summary judgment simply thinks are important; any additional facts should be confined to material facts in dispute."  *Ostreicher v. Chase Bank USA, N.A.*, No. 19-cv-8175 (CS), 2020 WL 6809059, at *1 n.1 (S.D.N.Y. Nov. 19, 2020).  Although Plaintiffs' submission does not comply with the Local Rules, the Court has exercised its "broad discretion to determine whether to overlook a party's failure to comply with local court rules," and has opted to conduct an "assiduous review of the record" for purposes of deciding the instant motion. *See Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) (quotation marks omitted);

*see also GEICO Marine Ins. Co. v. Mandel*, No. 19-cv-3107 (SJF) (AKT), 2020 WL 6318948, at

*2 (E.D.N.Y. Sept. 18, 2020), *adopted by* 2020 WL 5939186 (E.D.N.Y. Oct. 7, 2020).

      Second, at various points throughout their Response to Defendant's 56.1 Statement,

Plaintiffs do not respond to the asserted facts with evidence, but instead state that they "lack

knowledge or information sufficient to either admit or deny." *See, e.g.*, Pls.' 56.1 Resp. ¶¶ 25,

31, 38, 48, 56, 65, 73, 92, 98, 118.  Under Local Civil Rule 56.1, where the moving party has

properly "submit[ted] a statement of the allegedly undisputed facts on which the moving party

relies, together with citation to the admissible evidence of record supporting each such fact," and

"the opposing party then fails to controvert a fact so set forth in the moving party's Rule 56.1

statement, that fact will be deemed admitted."  *Giannullo v. City of New York*, 322 F.3d 139, 140

(2d Cir. 2003); *see also Cooper v. City of New Rochelle*, 925 F. Supp. 2d 588, 602 (S.D.N.Y.

2013) ("A nonmovant cannot raise a material issue of fact by denying statements which the

moving party contends are undisputed for lack of knowledge and information in part because

discovery allows the party opposing summary judgment to obtain the facts necessary to

determine whether it must admit or deny them." (quotation marks omitted)).

      Third, Defendant requests that the Court strike various portions of the declarations and

affidavits submitted by Plaintiffs and Plaintiffs' counsel that purportedly violate Rule 56 of the

Federal Rules of Civil Procedure.  ECF No. 97 ("Def.'s Reply") at 1-4.  While the Court will not

engage in a separate paragraph-by-paragraph exercise to list out which portions of these

submissions do and do not comply with the rules for submission of evidentiary material in

connection with summary judgment motions, the Court has reviewed each of the documents and

has only considered the materials that are properly before the Court.

### B.      Factual Background

Plaintiffs in this action are C.D.'s parents.  *See* Def.'s 56.1 Statement ¶ 4.  C.D. is a

minor child who is legally blind in his left eye, and suffers from asthma, a neuro-developmental

disorder, and anxiety.  *Id.* ¶ 6; *see, e.g.*, Pls.' 56.1 Statement ¶¶ 51, 128; ECF No. 89 ("C.D.

Aff.") ¶¶ 13, 19, 47.  As a result of his neuro-developmental disorder, C.D.'s sensory processing

and motor coordination are affected.  Def.'s 56.1 Statement ¶ 6.  In connection with his sensory

processing issues, C.D. has trouble finding clothing that does not bother his skin and tends to

wear baggy clothing.  *See* ECF No. 92 ("Sussman Aff.") Ex. 7; ECF No. 87 ("K. Dale Aff.") ¶

44; ECF No. 82 ("Sokoloff Decl.") Ex. E ("K. Dale Dep. I") at 53-54.[2]  In connection with his

motor coordination difficulties, C.D. falls down often—he tends to fall down stairs and misses

sitting on chairs.  Sussman Aff. Ex. 9 at 1; K. Dale Dep. I at 53.  While he was a student in the

District, C.D. had a "Section 504 accommodation plan"—often referred to as a "504 plan"—

which noted the program accommodations, modifications, and supports that he required.  *See*

Sussman Aff. Ex. 7 (C.D.'s 504 plan for 2017-2018 school year).  Between 2015 and 2020, C.D.

attended third through seventh grades in the District.  Plaintiffs allege that during this time, C.D.

was systematically bullied and harassed by both students and teachers on account of his

disabilities, which Plaintiffs allege created a hostile educational environment and detrimentally

impacted C.D.'s emotional well-being.  Am. Compl. ¶¶ 1-2, 27.

---

[2] Mrs. Dale was deposed twice in connection with this action—on June 20, 2019 and again on April 15, 2021.  *See* Sokoloff Decl. ¶¶ 8-9.  The Court cites to the June 20, 2019 deposition (Sokoloff Decl. Ex. E) as "K. Dale Dep. I," and the April 15, 2021 deposition (Sokoloff Decl. Ex. F) as "K. Dale Dep. II."

### 1.   2015-2016: Third Grade

During the 2015-16 school year, C.D. attended third grade at R.P. Connor Elementary School (the "Connor School") in the District.  Def.'s 56.1 Statement ¶ 7.

On June 14, 2016, C.D. fell out of his chair while in an art class taught by Stephen Pashley.  *Id.* ¶ 10.  Another student, M.B., laughed at C.D. in response, and C.D. told that student to stop laughing.  *Id.* ¶¶ 10-11.  Pashley then told C.D. to stop acting like a jerk.  *Id.* ¶ 11.  C.D. complained about Pashley's comment to the school principal at the time, Mary DiPersio.  *Id.* ¶ 14.  DiPersio addressed the matter in a meeting with C.D., Plaintiffs, and Pashley; during the meeting, Pashley apologized to C.D.  *Id.* ¶ 15.  C.D. asserts that after this incident, other children teased him about it.  C.D. Aff. ¶ 8.

On other occasions towards the end of third grade, C.D. felt that other students were being mean to him on the playground, but he testified that he does not recall whether he complained to any District employees about this.  Def.'s 56.1 Statement ¶ 16; Pls.' 56.1 Resp. ¶ 16.

### 2.   2016-2017: Fourth Grade

During the 2016-17 school year, C.D. attended fourth grade at the Connor School.  Def.'s 56.1 Statement ¶ 17.

On September 1, 2016, before the school year began, Mrs. Dale met with Kelly Benadi,[3] the newly appointed principal for the Connor School, who replaced DiPersio.  *Id.* ¶¶ 19, 20.  During this meeting, Mrs. Dale and Benadi discussed C.D.'s medical history and his 504 plan.  *Id.* ¶ 20.  They also discussed the incident from the previous year involving Pashley.  *Id.* ¶ 24.

---

[3] In certain documents submitted in connection with this motion, Benadi is referred to as "Kelly Dowd" or "Kelly Benadi Dowd."

That same day, C.D.'s fourth grade teacher, David Grammerstorf, met with Mrs. Dale and C.D.

*Id.* ¶ 26.  During this meeting, Mrs. Dale shared some of her concerns about C.D.'s 504 plan

with Grammerstorf.  *Id.*

Approximately two days after her meeting with Mrs. Dale, Benadi spoke with Pashley

about the meeting and discussed with Pashley the importance of ensuring that something like the

previous year's incident did not happen again.  *Id.* ¶ 29; Sokoloff Decl. Ex. J. ("Benadi Dep.") at

27-29.  Benadi testified that she directed Pashley to read C.D.'s 504 plan carefully to ensure that

he fully understood C.D.'s needs.  Def.'s 56.1 Statement ¶ 31; Benadi Dep. at 29.

On January 19, 2017, C.D. had another incident that involved Pashley.  On that date,

C.D. and another student, N.C., were talking while the students were lining up to leave art class.

Def.'s 56.1 Statement ¶ 43.  Pashley told C.D. and N.C. to be quiet.  *Id.*  According to C.D.,

Pashley "scream[ed]" at both him and N.C.  Sokoloff Decl. Ex. C ("C.D. Dep. I") at 52.[4, 5]  Later

that day, there was a meeting between Plaintiffs, Benadi, Pashley, Grammerstorf, and Dr.

Siobhan Garrison, the Connor School psychologist, to discuss the incident.  Def.'s 56.1

Statement ¶ 44.  After this incident, C.D. refused to go to art class.  *See id.* ¶ 49.  On January 30,

2017, Grammerstorf met with Plaintiffs about C.D.'s refusal to attend art class; Grammerstorf

also spoke with Pashley and C.D. about being positive and moving forward.  *Id.*  On January 31,

---

[4] C.D. was deposed twice in connection with this action—on June 18, 2019 and again on April 13, 2021.  *See* Sokoloff Decl. ¶¶ 6-7.  The Court cites to the June 18, 2019 deposition (Sokoloff Decl. Ex. C) as "C.D. Dep. I," and the April 13, 2021 deposition (Sokoloff Decl. Ex. D) as "C.D. Dep. II."

[5] Though these deposition transcripts are filed under seal, the Court noted in its order granting Defendant's motion to seal that "to the extent the Court relies on material from those exhibits in deciding the motion for summary judgment, the Court may reference such materials in a publicly available decision."  ECF No. 86.  Neither party raised any concerns in response to to that order, and accordingly, the Court references these materials as needed throughout this Decision and Order.

2017, Benadi, Grammerstorf, Plaintiffs, and C.D. had a meeting to discuss art class.  By the end of the meeting, C.D. agreed to try going back to art class.  *Id.* ¶ 50.

Also on January 31, 2017, while standing in line in the cafeteria, C.D. got into a physical altercation with another student.[6]  *Id.* ¶ 51; Pls.' 56.1 Resp. ¶ 51.  C.D. and the other student pushed each other, though the two did not exchange any words during the incident.  Def.'s 56.1 Statement ¶ 51.  Afterwards, Benadi spoke with both C.D. and the other student about how they could have better handled the situation.  *Id.* ¶ 52.[7]

During a February 22, 2017 meeting regarding C.D.'s 504 plan, Plaintiffs mentioned that C.D. was being teased, particularly during recess, but did not reference any specific incidents or students.  *Id.* ¶ 55.  At this meeting, the "504 team" determined that C.D. would receive more counseling moving forward.  *Id.*

On February 27, 2017, Mrs. Dale sent an email to Garrison to "touch base" about C.D. and wrote:

> [C.D.] was sobbing last Thursday night, and did not want to go to school again on Friday . . . .  The kids were making fun of him for not seeing well at a game.  He basically smashed his face and broke his glasses on Tuesday so he was without them for two days.

Sussman Aff. Ex. 11.  In response, Garrison wrote, "[t]here were some concerns at recess.  [C.D.] told me about them and I informed [Benadi].  [Benadi] is addressing these concerns tomorrow."  *Id.*

---

[6] Defendant asserts that this episode involved a student named J.H.; Plaintiffs deny this fact on the basis that "C.D. had an issue with J.F. not J.H. at this time."  *Compare* Def.'s 56.1 Statement ¶ 51, *with* Pls.' 56.1 Resp. ¶ 51.  This dispute is not material for purposes of this motion.

[7] Plaintiffs purport to deny this fact, but rather than submit evidence calling the fact into question, they offer testimony from C.D. that does not contradict the fact.  *See* Pls.' 56.1 Resp. ¶ 52.

Dr. Lisa Castaldo, who currently serves as the Assistant Superintendent for Pupil Personnel Services for the District and previously served as the Director of Pupil Personnel Services, testified that it had "probably" been reported to her by late March 2017 that students teased C.D. for falling. Sokoloff Decl. Ex. L ("Castaldo Dep.") at 49; Def.'s 56.1 Statement ¶ 57.

On April 6, 2017, Mrs. Dale attended a meeting with Garrison and Grammerstorf. During this meeting, she reported that other, identified students were making fun of C.D. for wearing glasses and for falling. Pls.' 56.1 Statement ¶ 65; K. Dale Aff. ¶ 21. Mrs. Dale also reported that C.D. had told Plaintiffs that other students repeatedly told him that nobody liked him, that he was left out of games during recess, and that he had a "crying spot." Pls.' 56.1 Statement ¶ 65; K. Dale Aff. ¶ 21; K. Dale Dep. I at 286-87.

On April 27, 2017, C.D. and his friend F.R. received detention from their physical education teacher, David McNally, which required them to eat lunch in the gym with McNally rather than in the cafeteria with the other students. Def.'s 56.1 Statement ¶ 68. During this lunch detention, C.D. experienced an asthma attack. *Id.* ¶ 70. According to C.D., he asked McNally if he could have his inhaler, and McNally told him no. C.D. Dep. I at 135. C.D. then left the gym to go to the nurse because he was having "a really bad asthma attack, and it later turned into an anxiety attack." *Id.* The next day, there was a meeting between Plaintiffs, Benadi, and McNally to discuss what had happened. Def.'s 56.1 Statement ¶ 74. Benadi eventually dismissed McNally from the meeting and continued to speak with Plaintiffs. *Id.* ¶ 76. At this point, Benadi presented Plaintiffs with several options for C.D. given that C.D. was experiencing issues with his "specials" (non-academic classes such as physical education and art): (1) C.D. could move from Grammerstorf's classroom to a different classroom; (2) C.D. could move to a different

classroom just for participation in specials; or (3) an aide could be assigned at recess to help monitor the children. *Id.* Plaintiffs responded that they would discuss options two and three with C.D., but stated that they did not want him moved out of Grammerstorf's class. *Id.* ¶¶ 77-78.

Shortly after the April 28, 2017 meeting, a classroom aide was placed into Grammerstorf's class. *See id.* ¶ 79.[8] Benadi told the aide to watch all the students in the classroom and, in particular, to keep an eye on the interactions between C.D., J.H., G.L., J.F., and N.T. *Id.* ¶ 84.

On June 8, 2017, J.F. kicked C.D.'s legs while the entire class was sitting on a carpet and watching a film. *Id.* ¶ 87. The two did not exchange any words before or after C.D. was kicked. *Id.* The new classroom aide and a reading specialist witnessed the event and provided incident reports to Benadi. *Id.* ¶¶ 90, 93. The reports describe an incident in which some children who were lying down were causing a disruption because their feet were too close to other students, which resulted in the students who were sitting being kicked. *Id.* ¶ 93. Because of the complaints, all students were instructed to sit up. *Id.* Mr. Dale emailed Benadi on June 9, 2017 to complain that his son had been bullied during this incident and requested a meeting with Benadi. *Id.* ¶ 94. Benadi initiated an investigation of the incident. *See id.* ¶ 96. Benadi

---

[8] Plaintiffs state that this fact is "denied," but in actuality they deny only the timing as to when Plaintiffs were informed that the aide would be assigned to C.D.'s class. *See* Pls.' 56.1 Resp. ¶ 79. The parties further dispute *why* the aide was placed into the classroom. The District asserts that the aide was placed in Grammerstorf's classroom because Benadi was receiving complaints from parents, including Plaintiffs, about student behavior in the class, and Grammerstorf said that the class was becoming difficult to manage. Def.'s 56.1 Statement ¶ 83. Plaintiffs maintain that the aide was placed in the classroom specifically to monitor C.D. Pls.' 56.1 Resp. ¶ 83. This dispute is not material for purposes of this motion.

recorded in a log she kept of communications with Plaintiffs[9] that after investigating, she determined that no bullying had taken place. *See* 2016-17 Benadi Log at 6.

On another occasion, a different student, C.Y., commented that C.D. was "blind as a bat" after C.D. had trouble catching a ball during recess. Def.'s 56.1 Statement ¶ 101; C.D. Dep. I at 131. C.D. reported this to Plaintiffs. Def.'s 56.1 Statement ¶ 101. Grammerstorf's log reflects that he spoke with C.D. and the offending student, and the offending student apologized for hurting C.D.'s feelings and said it was an accident. Grammerstorf Log at 3. Also at or around the same general time frame, a student, J.R., laughed in the lunch line after C.D. lost his balance and fell. Def.'s 56.1 Statement ¶ 102. C.D. reported this to Plaintiffs, *id.*, and Plaintiffs maintain that Mrs. Dale reported this to Grammerstorf, K. Dale Aff. ¶ 74. On still another occasion, a different student, N.T., called C.D. a "drugged Mickey Mouse." Def.'s 56.1 Statement ¶ 103. C.D. reported this to Grammerstorf, and Grammerstorf took N.T. out of the classroom and into the hallway to speak with him. *Id.* Also during this time period, two students, G. and J., repeatedly accused C.D. of doing things he did not do in attempts to get him into trouble, and on one occasion, C.D.'s teacher reported to Mrs. Dale that he observed G. and J. high fiving after C.D. got into trouble. Pls.' 56.1 Statement ¶¶ 60, 64, 66, 72; K. Dale Aff. ¶ 22.

In June 2017, Mrs. Dale wrote a multi-page email to Castaldo, copying, among others, Benadi, Grammerstorf, and an "AllBoardMembers" listserv stating:

---

[9] In support of its motion, the District has submitted communication "logs" maintained by both Benadi and Grammerstorf to record their meetings with Plaintiffs and incidents involving C.D. *See* Sokoloff Decl. Exs. O ("2016-17 Benadi Log"), P ("2017-18 Benadi Log"), Q ("Grammerstorf Log"). Both Benadi and Grammerstorf also submitted affidavits stating that they maintained these logs contemporaneously, or near-contemporaneously, in the normal course of business. *See* ECF Nos. 78, 79.

> We have left you guys all a paper trail throughout the year documenting the emotional and verbal abuse our son has endured . . . .  But seriously, at what point is being called things like: glasses, annoying, blind as a bat, the class faller, wanna be, girl . . . finally enough?  This is on top of being told he will grow up to be a murderer, nobody likes him, children don't want to be his friend, he falls on purpose, and he falls for attention.

Sussman Aff. Ex. 4 at 1-4.  Mr. Dale sent a similar email to "AllBoardMembers" in July 2017 discussing the changes that Plaintiffs wanted to see for the following school year.  *Id.* at 15.  On August 30, 2017, Plaintiffs' attorney wrote a letter to the District, through its attorney, requesting a meeting to discuss C.D.'s issues from the previous year, development of an updated sensory diet plan, and other additions to C.D.'s 504 plan.  Sussman Aff. Ex. 3; Pls.' 56.1 Statement ¶ 127.  The letter also includes allegations of bullying similar to those set forth by Plaintiffs in their previous emails to District officials.  *See* Sussman Aff. Ex. 3.

### 3.   2017-2018: Fifth Grade

During the 2017-2018 school year, C.D. was in fifth grade.  Def.'s 56.1 Statement ¶ 104.  C.D. began fifth grade at the Connor School, but transferred to another school in the District partway through the year.  *See id.* ¶ 144.

On August 31, 2017, before the school year began, Benadi met with C.D.'s assigned fifth grade teachers, the school occupational therapist, the school nurse, and the school 504 coordinator to review C.D.'s 504 plan.  *Id.* ¶¶ 105-06.  The group discussed communicating as a team, being transparent in communications, and the types of behaviors that seemed to escalate stressful situations for C.D. and how to deescalate such situations.  *Id.*

On September 6, 2017, C.D. reported to Carol Diamant, the Connor School nurse, that he was bullied on the playground by two of his classmates while playing soccer.  *Id.* ¶ 107.  Diamant completed a form in accordance with New York's Dignity for All Students Act

("DASA"), N.Y. Educ. Law § 10 *et seq.*,[10] and Benadi conducted an investigation.  *See id.* ¶ 108.

At the end of the day, Benadi emailed Plaintiffs regarding the incident, stating that after

investigating, she determined that the incident was not an instance of bullying, but rather of "bad

sportsmanship."  Sokoloff Decl. Ex. Z.

On September 18, 2017, C.D. was talking to another student, S.M., about what type of

video he should post on his YouTube account, when two other students, S.V. and A.K.,

interjected into the conversation.  Def.'s 56.1 Statement ¶ 111.  According to C.D., S.V. said that

C.D. should jump off a bridge and A.K. added "yeah, in shallow water."  *Id.*  C.D. states that he

asked the students if they were telling him to commit suicide and S.V. responded, "yeah we are."

*Id.*  After the incident, C.D. went to Diamant and told her what happened and also called Mrs.

Dale.  *Id.* ¶ 115.  Diamant then called A.K. and S.V. to her office to speak to them.  *Id.* ¶ 116.

Mrs. Dale picked C.D. up from school and took him home early.  *Id.* ¶ 117.  A DASA form was

completed.[11]  Sokoloff Decl. Ex. AA.  Benadi spoke to S.V. and A.K. about their conduct,

---

[10] DASA provides:

> No student shall be subjected to harassment or bullying by employees or
> students on school property or at a school function; nor shall any student be
> subjected to discrimination based on a person's actual or perceived race,
> color, weight, national origin, ethnic group, religion, religious practice,
> disability, sexual orientation, gender, or sex by school employees or
> students on school property or at a school function.

N.Y. Educ. Law § 12(1).  The law requires school districts to create policies, procedures, and
guidelines intended to create a school environment that is free from harassment, bullying, and
discrimination, including identifying a school employee to be charged with receiving reports of
harassment, bullying, and discrimination, and requiring that employee to lead or supervise the
prompt and thorough investigation of all such reports.  *Id.* § 13(1).

[11] It is not evident from the version of this form that was submitted with Defendant's
motion papers who completed the form.  It appear as though the second page of the form was not
included in the record.  *Compare* Sokoloff Decl. Ex. AA, *with* Sussman Aff. Ex. 31.

removed them from the school's "Safety Patrol," and required them to complete a "kindness project."  Def.'s 56.1 Statement ¶ 121.

Mr. Dale sent an email to "AllBoardMembers" on September 25, 2017, noting that C.D. "has not worn his glasses to school yet this year, as he fears he will be teased."  Sussman Aff. Ex. 4 at 21, 24.

On September 27, 2017, Diamant completed a DASA form reflecting that C.D. reported that during a game of four square, J.F. told him, "why don't you get your glasses back – you can't see!"  Sussman Aff. Ex. 31; *see also* 2017-18 Benadi Log at 9 ("C told Mrs. Keenan that J.F. was bullying him while on the playground.  J.F. told the student that if he were wearing his glasses, he would have seen that the ball was out.  The student alleged that now the kids are bullying him to wear his glasses.").

On October 2, 2017, Castaldo led a meeting attended by Benadi, Diamant, a school occupational therapist, C.D.'s teachers, and Plaintiffs to discuss C.D. and ensure that all of C.D.'s teachers were fully aware of his 504 plan.  Def.'s 56.1 Statement ¶¶ 124-25.  During the meeting, Castaldo suggested that C.D. attend intensive day treatment, a three-week program that the District used for students struggling in their school environment to examine a student's needs.  *Id.* ¶¶ 126-27.  Plaintiffs rejected this suggestion.  *Id.* ¶ 128.  Castaldo also offered to provide C.D. with non-mandated in-school counseling.  *Id.* ¶ 129.

On October 4, 2017, C.D. spoke to Grammerstorf about the September 18, 2017 incident with the two students in art class and asked Grammerstorf if he should do what the students told him to do.  *Id.* ¶ 131.  Grammerstorf reported this conversation to Benadi, who in turn told Grammerstorf to contact Plaintiffs about it immediately.  *Id.* ¶ 132.  Benadi and Grammerstorf also contacted Castaldo.  *See id.* ¶ 133.  Grammerstorf called Mrs. Dale about his conversation

with C.D. and spoke to Mrs. Dale about having C.D. examined. *Id.* ¶¶ 134-35. On October 6, 2017, Plaintiffs took C.D. to a psychiatric facility for adolescents. *Id.* ¶ 138. On October 9, 2017, Benadi received a medical note from C.D.'s doctor, which stated that C.D. had been "placed . . . on immediate medical leave from school effective today through the next two weeks." *See* Sussman Aff. Ex. 5 at 7; *id.* Ex. 23.

On October 20, 2017, Plaintiffs requested that C.D. be transferred to another elementary school in the District. Def.'s 56.1 Statement ¶ 143. The District granted this request on October 25, 2017 and C.D. was transferred to Cherry Lane Elementary School ("Cherry Lane"), where he completed fifth grade. *Id.* ¶ 144. Although the District agreed to the transfer, the school superintendent, Dr. Douglas Adams, stated in a letter to Plaintiffs that "the statements made by you and your doctor alleging an unsafe and toxic environment at R.P. Connor are completely false." Sussman Aff. Ex. 6. C.D. had no complaints about his time at Cherry Lane. Def.'s 56.1 Statement ¶ 145.

### 4.  2018-2019: Sixth Grade

During the 2018-2019 year, C.D. was in sixth grade at Suffern Middle School ("SMS"). *Id.* ¶ 153.[12]

---

[12] In their Counterstatement of Material Facts, Plaintiffs include a number of allegations that were not included in the Amended Complaint, and which appear to have been raised for the first time in this filing in opposition to the District's motion for summary judgment. These include statements concerning, *inter alia*, an alleged incident involving C.D.'s humanities teacher sending C.D. to the back of the classroom to sit on a bouncing ball, and a general allegation that unnamed classmates made fun of C.D. for missing class to receive vision services. *See* Pls.' 56.1 Statement ¶¶ 179, 188-90. In support of these new assertions, Plaintiffs cite exclusively to an affidavit submitted by C.D. in support of Plaintiffs' opposition. *Id.* The Court declines to consider these facts, as they do not form the basis for Plaintiffs' claims in the operative pleading, and the Amended Complaint may not be further amended simply by raising new facts in opposition to Defendant's motion. *See Tomlins v. Vill. of Wappinger Falls Zoning Bd. of Appeals*, 812 F. Supp. 2d 357, 363 n.9 (S.D.N.Y. 2011).

During the summer of 2018, before the school year began, a meeting took place to discuss C.D.'s transition from Cherry Lane to SMS.  *Id.* ¶ 154.  Also around this time, C.D. met with Dr. Elliott Kagan, a school psychologist who worked for the District.  *Id.* ¶ 155.  Kagan was C.D.'s in-school counselor when C.D. attended SMS.  *Id.* ¶ 157.  At some point in middle school, it was decided during a 504 planning discussion that C.D. needed greater clinical services; accordingly, the District arranged for C.D. to see Kagan twice per week, and sometimes on a day-to-day basis.  *Id.*  While at SMS, C.D. found his meetings with Kagan to be helpful.  *Id.* ¶ 193.

C.D. began the school year by making new friends, but C.D. asserts that those friends had "dropped" him by December.  *Id.* ¶ 164.  C.D. blames students from the Connor School, including N.T., J.F., G.L., and J.H., for ending his new friendships by "getting into his [new] friends' heads."  *Id.*  Plaintiffs reported these social issues to Castaldo.  *See* Pls.' 56.1 Statement ¶ 173; K. Dale Aff. ¶ 38.

In January 2019, C.D. had an altercation in the gym locker room with a student, L.S. Def.'s 56.1 Statement ¶ 166.  According to C.D., L.S. physically attacked him after C.D. made a comment about L.S.'s girlfriend.  *Id.* ¶ 168.  C.D. asserts that L.S. "took [his] arm and bent it behind [his] back and started beating on [him]" until he fell to the ground.  C.D. Dep. II at 92. C.D. reported this incident to the school guidance counselor.  Def.'s 56.1 Statement ¶ 169.  After the incident, other students made fun of C.D. for not fighting back against L.S. and for reporting the incident, calling C.D. a "pussy" and a "snitch."  *Id.* ¶ 171.

Outside of school, C.D. continued to feel excluded by his classmates.  On one occasion in March 2019, some students invited C.D. to a social media chat room using the "house party" app.  *Id.* ¶ 173; C.D. Dep. I at 25-26.  But when C.D. entered the "room," a student indicated that

he wanted to leave because he was afraid of C.D.  Def.'s 56.1 Statement ¶ 173.  Mrs. Dale

recorded the interaction and presented it to Castaldo.  *Id.* ¶ 176; K. Dale Aff. ¶ 40.  That same

month, C.D. invited five friends from school to his birthday party.  Def.'s 56.1 Statement ¶ 177.

Although they each accepted the invitation initially, all five cancelled before the party was to be

held on April 6, 2019.  *Id.*

At school, C.D.'s teachers attempted to help him make friends.  Kagan recommended that

C.D. join an extracurricular activity, the Green Team, which involved gardening.  *Id.* ¶ 189.

C.D.'s sixth grade science teacher encouraged other students to spend time in her classroom

during lunch so that C.D. could socialize with them.  *Id.* ¶ 191.

C.D. testified that around this time, he was being bullied specifically by one student, N.T.

N.T. and C.D. had been friends in third grade, but they began having issues around fourth grade.

*See* Def.'s 56.1 Statement ¶¶ 22-23.  According to C.D., N.T. "constantly" made fun of C.D.'s

disabilities, namely his balance issues, vision, and the way that C.D. tapped his fingers when

anxious.  C.D. Dep. II at 149, 163, 171-72.  C.D. spoke with Kagan about his interactions with

N.T., though Kagan does not recall specific details of these conversations.  *Id.* at 164-65; *see*

Sokoloff Decl. Ex. M ("Kagan Dep.") at 74-77.  Kagan testified that he never witnessed any

students bully C.D., but that he did not use that as a basis to disbelieve what C.D. had told him

about bullying.  Kagan Dep. at 40-42.

On April 24, 2019, a local newspaper published an article headlined "In Suffern, school

board upstarts rile community by suspending superintendent."  Def.'s 56.1 Statement ¶ 179;

Sokoloff Decl. Ex. CC ("*Journal News* Article").  In the article, it was reported that during the

previous year, Mr. Dale made financial contributions to three successful candidates for the

Suffern Central School District Board of Education, and that those new board members went on

to "divide[] the community by suspending long-time Superintendent Douglas Adams." *Journal News* Article at 1.  A subsection of the article labeled "Who is Dale?" included discussion of, among other things, this lawsuit, other cases filed by Mr. Dale, and a police report filed by Adams's wife in May 2018 in which she alleged that Mr. Dale was on her property one night at midnight.  *Id.* at 6.  C.D. testified that the article created "a very embarrassing situation," was "devastating," and "crushed" his family.  Def.'s 56.1 Statement ¶ 185; C.D. Dep. II at 23.  He further believes that this article is one of the reasons that he struggled to make friends in middle school.  Def.'s 56.1 Statement ¶¶ 186-87.

After the article was published, Plaintiffs attended a meeting with "eight to twelve people from the District" including Castaldo and Kagan, where they discussed "how C.D. [was] struggling after this article had come out."  K. Dale Dep. II at 674; *see also* K. Dale Aff. ¶ 43; Pls.' 56.1 Statement ¶ 199.

### 5.   2019-2020: Seventh Grade

C.D. was a seventh grader at SMS during the 2019-2020 school year.  Def.'s 56.1 Statement ¶ 195.  C.D. asserts that during this year, he had no friends.  *Id.*

In September 2019, C.D. joined the school podcast club, but dropped out shortly thereafter because N.T., who was also in the club, called C.D. "faller, Mr. Tapman," and commented on Kagan's presence, which made C.D. feel unsafe.  Pls.' 56.1 Statement ¶¶ 205-06; C.D. Dep. II at 171-72.

In October 2019, C.D. was hospitalized after he attempted suicide.  Def.'s 56.1 Statement ¶ 196.  After that, C.D. was out of school for a period of time.  *See* Pls.' 56.1 Statement ¶ 208.

According to Mrs. Dale, in December 2019 and January 2020, she and her husband complained to District administrators that C.D. remained socially isolated and excluded from

school activities, and that students who taunted him had "fastened upon" his baggy clothing, which he wore due to his neuro-developmental disorder.  K. Dale Aff. ¶ 44; Pls.' 56.1 Statement ¶ 209.

In January 2020, three students attempted to photograph C.D. while he was using the bathroom at school.  Def.'s 56.1 Statement ¶ 197.  C.D. reported this incident to the school principal.  *Id.* ¶ 198.

In February 2020, SMS students accused C.D. of having nude photos of a female student on his phone.  *Id.* ¶ 199.  According to C.D., another student, K., showed C.D. a nude photo of a female student while C.D. and K. were in the bathroom together.  *Id.*  C.D. then reported this to the school principal.  *Id.*  C.D. asserts that K. subsequently accused C.D. of being the one with the nude photos on his phone.  *Id.*

Plaintiffs also set forth that C.D. was absent from school on numerous occasions in February and March 2020 due to his anxiety, and that on March 6, 2020, an unnamed student physically assaulted him for touching the other student's desk.  Pls.' 56.1 Statement ¶¶ 219-20; C.D. Aff. ¶¶ 47-48.  No details about this alleged assault are presented by the parties in their summary judgment submissions.

In May 2020, C.D. began attending the Barnstable Academy, a private school in New Jersey.  Def.'s 56.1 Statement ¶ 201.  The District pays for C.D.'s attendance at the school.  Pls.' 56.1 Resp. ¶ 201.

### 6.    C.D.'s Journals

Beginning in January of fourth grade, C.D. wrote in personal journals about how he felt, and specifically about incidents that took place at school.  C.D. Dep. II at 68, 76-77.  He testified about three separate journals that he kept during periods relevant to this litigation: one in fourth

grade, one in fifth grade, and one as he was approaching middle school.  *Id.* at 63-64, 73-74, 76, 79.  C.D. testified that he discarded all three of these journals.  *Id.* at 79.  He explained at his deposition that he did not recall when he threw out the fourth grade journal, but he did remember that he threw out his fifth grade journal when he was at Cherry Lane, and threw out his middle school journal sometime after he transferred to the Barnstable Academy in 2020.  *Id.* at 63-64, 73-74, 76, 79.  Plaintiffs knew about C.D.'s journaling and encouraged him to write as a way to "express himself."  K.D. Aff. ¶ 49.

### C.    Procedural History

Plaintiffs initiated this action by filing a complaint on May 18, 2018, ECF No. 1, and subsequently filed an amended complaint on May 20, 2020, *see* Am. Compl.  Defendant filed its motion for summary judgment and supporting materials on April 27, 2022.  ECF Nos. 76-82.  On June 7, 2022, Plaintiffs submitted their opposition to the motion along with supporting materials.  ECF Nos. 87-92.  The motion was fully submitted on July 14, 2022 when Defendant filed its reply brief.  ECF No. 97.

## LEGAL STANDARD

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 320-23 (1986).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining whether a genuine issue of material fact exists, a court is required to "constru[e] the evidence in the light most favorable to the nonmoving party and draw[] all reasonable inferences in its favor."  *Mount*

*Vernon Fire Ins. Co. v. Belize NY, Inc.*, 277 F.3d 232, 236 (2d Cir. 2002); *Farias v. Instructional Sys., Inc.*, 259 F.3d 91, 97 (2d Cir. 2001); *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 764 (2d Cir. 1998); *see also Anderson*, 477 U.S. at 261 n.2.  A party cannot overcome summary judgment by relying on "mere speculation or conjecture as to the true nature of the facts" because "conclusory allegations or denials" cannot "create" genuine disputes of material fact "where none would otherwise exist."  *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quotation marks omitted).  Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge[.]"  *Anderson*, 477 U.S. at 255; *accord Williams v. N.Y.C. Housing Auth.*, 61 F.4th 55, 76 (2d Cir. 2023).  "Only when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted."  *Cruden v. Bank of N.Y.*, 957 F.2d 961, 975 (2d Cir. 1992) (citing *H.L. Hayden Co. v. Siemens Med. Sys. Inc.*, 879 F.2d 1005, 1011 (2d Cir. 1989)).

## DISCUSSION

### A.    Administrative Exhaustion

The District first argues that because Plaintiffs purportedly failed to exhaust their administrative remedies, this case should be dismissed for lack of subject matter jurisdiction. Def.'s Mem. at 2-6.  The Court disagrees.

In general, plaintiffs seeking "relief for the denial of a [free appropriate public education ('FAPE')]" must "exhaust the [Individuals with Disabilities Education Act's ('IDEA')] procedures before filing an action under . . . the Rehabilitation Act," regardless of whether the claims are also brought pursuant to the IDEA.  *Fry v. Napoleon Cmty. Schs.*, 580 U.S. 154, 165 (2017); *see* 20 U.S.C. § 1415(*l*) (requiring IDEA exhaustion before filing claims under other

federal statutes—including the Rehabilitation Act—to extent the relief sought "is also available

under" the IDEA).  Under the IDEA, "[p]arents are specifically entitled to request a due process

hearing in order to present complaints as 'to any matter relating to . . . the provision of a

[FAPE].'"  *Cave v. E. Meadow Union Free Sch. Dist.*, 514 F.3d 240, 245 (2d Cir. 2008) (quoting

20 U.S.C. § 1415(b)(6)(A)).  "Only after exhaustion of these procedures has an aggrieved party

the right to file a suit in a federal or state court."  *Id.*  "[T]he theory behind the grievance may

activate the IDEA process, even if the plaintiff wants a form of relief that the IDEA does not

supply."  *Id.* at 246 (quotation marks omitted).  To determine whether an action seeks relief for

denial of a FAPE, "a court should look to the substance, or gravamen, of the plaintiff's

complaint."  *Fry*, 580 U.S. at 165.  The Supreme Court provided the following guidance for

courts to determine if the "gravamen" of a complaint is denial of a FAPE:

> First, could the plaintiff have brought essentially the same claim if the alleged
> conduct had occurred at a public facility that was *not* a school—say, a public theater
> or library?  And second, could an *adult* at the school—say, an employee or visitor—
> have pressed essentially the same grievance?  When the answer to those questions
> is yes, a complaint that does not expressly allege the denial of a FAPE is also
> unlikely to be truly about that subject; after all, in those other situations there is no
> FAPE obligation and yet the same basic suit could go forward.   But when the
> answer is no, then the complaint probably does concern a FAPE, even if it does not
> explicitly say so[.]

*Id.* at 171 (emphases in original).  "[I]f, in a suit brought under a different statute, the remedy

sought is not for the denial of a FAPE, then exhaustion of the IDEA's procedures is not

required."  *Id.* at 168.  Moreover, the IDEA's exhaustion requirement does not apply to litigants

seeking relief—such as compensatory damages—that the IDEA does provide.  *Luna Perez v.*

*Sturgis Pub. Schs.*, 598 U.S. 142, 147-48 (2023).

Here, IDEA exhaustion was not required.  First, although Plaintiffs' allegations

occasionally touch on denial of a FAPE, *see* Am. Compl. ¶¶ 207, 215-16, 219, 223, "the

gravamen of Plaintiffs' claims is not the denial of a FAPE or the inadequacy of the education

afforded to [C.D.], but rather . . . deliberate indifference to disability-based bullying," *Spring v. Alleghany-Limestone Cent. Sch. Dist.*, No. 14-cv-476S, 2022 WL 1557053, at *10 (W.D.N.Y. May 17, 2022).  Indeed, based on the facts and circumstances presented here, the answers to both hypothetical questions posed in *Fry* are "yes"—"the repeated harassment and bullying of a disabled student at a public library or a disabled adult employed [by the District] could form the basis of a claim under the []Rehabilitation Act."  *Parker-Leon v. Middle Vill. Preparatory Charter Sch.*, No. 17-cv-4548 (NGG) (RML), 2019 WL 2394211, at *6 (E.D.N.Y. June 6, 2019). Accordingly, "Plaintiffs' []Rehabilitation Act claims primarily concern the discriminatory harassment of their son and the school's alleged failure to prevent such conduct, and therefore are not subject to the IDEA's exhaustion requirement." *Id.* at *5 (citation omitted).  Second, Plaintiffs seek a form of relief that the IDEA cannot provide—specifically, compensatory damages. *See* Am. Compl. at 34.  In such circumstances, exhaustion is not required. *Luna Perez*, 598 U.S. at 147-48.

But even assuming administrative exhaustion were required, the exhaustion requirement may be excused where "parents have not been notified that such [administrative] remedies were available to them." *See Weixel v. Bd. of Educ. of City of N.Y.*, 287 F.3d 138, 149 (2d Cir. 2002); *see Baldessarre ex rel. Baldessarre v. Monroe-Woodbury Cent. Sch. Dist.*, 496 F. App'x 131, 134 (2d Cir. 2012) (summary order) (describing this as an argument that exhaustion would have been futile).  "This is so because the failure of defendants to notify plaintiffs of their procedural rights under the IDEA deprive[] them of the opportunity to take advantage of the procedural safeguards offered by the statute." *Weixel*, 287 F.3d at 149 (cleaned up).  Plaintiffs seeking to demonstrate that IDEA exhaustion requirements would be futile bear the burden of proof as to this point. *J.S. ex rel. N.S. v. Attica Cent. Schs.*, 386 F.3d 107, 112 (2d Cir. 2004).

Plaintiffs assert—and Defendants do not contest—that the District never made them aware of any administrative remedies that may have been available to them.[13]  *See* K. Dale Aff. ¶ 82 ("no one associated with the school district even suggested that we 'exhaust administrative remedies' as a means of seeking redress for C.D.'s bulling"); ECF No. 88 ("A. Dale Aff.") ¶ 21 ("[N]o one associated with the district EVER raised [administrative remedies] with me or my wife and we never received any procedural safeguards advising us of any administrative process we could utilize to redress our concerns about the bullying C.D. endured." (capitalization in original)).  The District has not identified any evidence in the voluminous record—which includes evidence of numerous communications between District employees and Plaintiffs— showing that any District employee ever made Plaintiffs aware of any administrative process that was available to them to address the issues that form the basis of the Amended Complaint.  Thus, viewing the evidence in the light most favorable to Plaintiffs, Plaintiffs have met their burden at this stage of the litigation to show that the District failed to notify them of any procedural rights they may have had under the IDEA, which would excuse the failure to exhaust administrative remedies even if administrative exhaustion were required here.  *See Weixel*, 287 F.3d at 149; *see also Keitt v. New York City*, 882 F. Supp. 2d 412, 436 (S.D.N.Y. 2011) (adopting report and recommendation recommending that exhaustion be excused at motion to dismiss stage where plaintiff alleged that defendants "failed to provide notice of the procedural safeguards available under the IDEA").

---

[13] Plaintiffs also cite in their opposition brief to "the Proposed SAC," which, according to Plaintiffs, alleges that they were "never informed of their due process rights or procedure for which to challenge the IEP."  ECF No. 90 ("Pls.' Opp.") at 9.  It is unclear what Plaintiffs are referencing—they never filed a proposed second amended complaint on the docket, and no such document was submitted in connection with their opposition to Defendant's motion.

Accordingly, the Court will not dismiss Plaintiffs' claims for failure to exhaust administrative remedies.

**B.     Disability Discrimination**

The District next asserts that there is insufficient evidence in the record to enable a reasonable jury to conclude that C.D. was subjected to discrimination on the basis of his disability.  Def.'s Mem. at 6-15.  Again, the Court disagrees.

**1.     Legal Standard**

Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ."  29 U.S.C. § 794(a).  To establish a violation of Section 504, a plaintiff must show (1) that he is a qualified individual with a disability; (2) that he was excluded from participation in a public entity's services, programs or activities or was otherwise discriminated against by the public entity; and (3) such exclusion or discrimination was due to his disability.  *See B.C. v. Mount Vernon Sch. Dist.*, 837 F.3d 152, 158 (2d Cir. 2016).  There is no dispute here that C.D. is a qualified individual with a disability or that the District is a public entity subject to Section 504.

To recover monetary damages under Section 504, a plaintiff must show "intentional" discrimination.  *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 275 (2d Cir. 2009).  "The standard for intentional violations is deliberate indifference to the strong likelihood of a violation: in the context of the Rehabilitation Act, intentional discrimination against the disabled does not require personal animosity or ill will."  *Id.* (cleaned up).  Rather, deliberate indifference "occurs where an official with authority to address the alleged discrimination and to institute

corrective measures on Plaintiff's behalf had actual knowledge of ongoing discrimination against Plaintiff but failed to respond adequately." *Froio v. Monroe-Woodbury Cent. Sch. Dist.*, No. 17-cv-604 (CS), 2020 WL 2731970, at *6 (S.D.N.Y. May 26, 2020) (quotation marks omitted).

Though it has not been specifically addressed by the Supreme Court or the Second Circuit, courts in this Circuit have found that a school district may be liable for disability discrimination under Section 504 based on peer-to-peer harassment.[14] *See K.M.*, 381 F. Supp. 2d at 359-60; *see also Eskenazi-McGibney v. Connetquot Cent. Sch. Dist.*, 84 F. Supp. 3d 221, 231-32 (E.D.N.Y. 2015). In such circumstances, the district is not held liable for the actions of the harassing students, but can be held liable for its own deliberate indifference to the acts of the harassing students. *See K.M.*, 381 F. Supp. 2d at 359. To establish such a claim, a plaintiff must show: (1) "pervasive, severe disability-based harassment that effectively deprived a disabled student of access to the school's resources and opportunities," and that (2) a school district reacted to said harassment with "deliberate indifference." *Id.* at 360.

According to the District, Plaintiffs' claim should not be permitted to go to a jury because (1) Plaintiffs have failed to show that C.D. was bullied and harassed on account of his disabilities, and (2) in light of the District's responses to Plaintiffs' complaints, a reasonable jury could not find that the District acted with deliberate indifference. Def.'s Mem. at 10-15.

### 2.    Harassment and Bullying Due to Disabilities

"[E]ven if students with disabilities are more likely to be bullied than students without disabilities, both based on their disabilities and based on other factors, a plaintiff nevertheless

---

[14] In reaching these conclusions, courts have followed Supreme Court and Second Circuit caselaw addressing peer-to-peer harassment in the context of claims of gender-based discrimination. *See, e.g.*, *K.M. ex rel. D.G. v. Hyde Park Cent. Sch. Dist.*, 381 F. Supp. 2d 343, 359-60 (S.D.N.Y. 2005) (applying standard set forth in a Title IX discrimination case, *Davis ex rel. Lashonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999)).

does not state a claim under . . . Section 504 absent some factual allegation linking the disability

and the bullying." *Eskenazi-McGibney*, 84 F. Supp. 3d at 233; *see also Cain v. Mandl Coll. of*

*Allied Health, Mandl Coll., Inc.*, No. 14-cv-1729 (ER), 2016 WL 5799407, at *7 (S.D.N.Y. Sept.

30, 2016); *Spring*, 2022 WL 1557053, at *12-13.[15]

The District asserts that the three alleged incidents of teacher-on-student harassment are

not actionable under the Rehabilitation Act because they are "unrelated" to C.D.'s disabilities,

and that various incidents of alleged peer-to-peer harassment and bullying are not actionable

because they are no more than "simple teasing, insulting, name-calling, pushing, or shoving."

*See* Def.'s Mem. at 12-13; *Carabello v. N.Y.C. Dep't of Educ.*, 928 F. Supp. 2d 627, 644

(E.D.N.Y. 2013) ("'simple acts of teasing and name-calling among school children' are

insufficient to serve as the basis of a discrimination claim under Title IX" (quoting *Davis*, 526

U.S. at 652)).  While the District is correct that there is no discernible factual basis to link many

of the episodes set forth in the pleadings to C.D.'s disabilities, a reasonable jury could conclude

that the following bullying and harassment incidents alleged by C.D. are sufficiently related to

his asthma, vision issues, neuro-developmental disorder, and anxiety:

---

[15] In their briefing, the parties apply the same standards in evaluating Plaintiffs' allegations concerning C.D.'s teachers as they do in evaluating allegations of peer-to-peer harassment, *see* Def.'s Mem. at 10-11, 13; Pls.' Opp. at 15-16, and therefore the Court assumes, without deciding, that the legal standards set forth above also apply to Plaintiffs' allegations concerning C.D.'s teachers.  The Court is mindful, however, that in the Title IX context, the Supreme Court has noted that "[t]he relationship between the harasser and the victim necessarily affects the extent to which the misconduct can be said to breach Title IX's guarantee of equal access to educational benefits and to have a systemic effect on a program of activity," and that therefore, "[p]eer harassment . . . is less likely to satisfy these requirements than is teacher-student harassment."  *Davis*, 526 U.S. at 653.

- On June 14, 2016, when C.D. was in third grade, C.D. fell out of his chair in Pashley's art class, which caused another student, M.B., to laugh at him.  Def.'s 56.1 Statement ¶ 10.  C.D. told M.B. to stop laughing, and Pashley told C.D. to stop acting "like a jerk."  *Id.* ¶ 11.[16]

- On February 27, 2017, Plaintiffs wrote to Garrison saying, "kids were making fun of [C.D.] for not seeing well at a game.  He basically smashed his face and broke his glasses on Tuesday so he was without them for two days."  Sussman Aff. Ex. 11.

- Mrs. Dale claims that she met with Garrison and Grammerstorf on April 6, 2017 "and reported that other, identified students were making fun of C.D. for wearing glasses and for falling."  K. Dale Aff. ¶ 21; Pls.' 56.1 Statement ¶ 65.

- Sometime during fourth grade, C.Y. called C.D. "blind as a bat" when C.D. had trouble catching a ball during recess.  Def.'s 56.1 Statement ¶ 101; C.D. Dep. I at 131.

- Also during fourth grade, J.R. laughed at C.D. after C.D. lost his balance and fell in the lunch line.  Def.'s 56.1 Statement ¶ 102.

- On April 27, 2017, C.D. and a friend received lunch detention from McNally, their physical education teacher.  Def.'s 56.1 Statement ¶ 68.  While in detention, C.D. suffered an asthma attack.  McNally did not allow C.D. to get his inhaler or go to the nurse's office right away, and as a result of this delay in being allowed to treat his asthma, C.D. suffered an anxiety attack.  *Id.* ¶ 70; C.D. Dep. I at 135-36.

- On September 27, 2017, Diamant completed a DASA form after J.F. told C.D., "why don't you get your glasses back – you can't see!"  Sussman Aff. Ex. 31.

- In middle school, students "fastened upon" C.D.'s baggy clothing as a basis for taunting him.  K. Dale Aff. ¶ 44.

---

[16] Plaintiffs assert that a second incident involving Pashley also amounts to disability-based harassment.  As to this second episode, the Court disagrees.  In January 2017, C.D. and his classmates were lining up to leave Pashley's art class, and C.D. and another student were talking when they were supposed to be silent.  Def.'s 56.1 Statement ¶ 43.  According to Defendant, Pashley raised his voice at C.D. and another student, N.C., telling them to be quiet.  *Id.*  In C.D.'s telling, Pashley not Pashley screamed in C.D.'s face.  C.D. Dep. I at 34-35.  But even viewing the facts in the light most favorable to Plaintiffs, there is nothing in the record to support that Pashley's conduct—directed at C.D. and, notably, another student who is not alleged to have any disabilities—had anything to do with C.D.'s disabilities.  Plaintiffs contend, without support, that "Pashley knew that C.D. was sensitive to raised voices, particularly directed to him."  *See* Pls.' Opp. at 16.  But this allegation breaks down quickly—Plaintiffs have presented no evidence or basis for inferring that C.D.'s disabilities make him "sensitive to raised voices," and nothing in the record supports the notion that Pashley knew about this sensitivity, to the extent it exists.

- One particular student, N.T., "constantly harassed" C.D., mocking him for his glasses, his tendency to fall, and for tapping his fingers, which Plaintiffs assert is a side effect of C.D.'s anxiety.  C.D. Dep. II at 149, 163-164, 171-72.  As a result of this particular bullying in middle school, C.D. dropped out of extracurricular activities in which N.T. participated.  *See* C.D. Dep. II at 162-68, 171-72 (testifying that C.D. left the Green Team and podcast club because of N.T.).

As for other incidents, however, there is not sufficient evidence in the record from which a reasonable jury could conclude that peer harassment and bullying directed at C.D. was undertaken on the basis of his disability.  The following incidents cannot serve as a basis for Plaintiffs' Rehabilitation Act claim:

- On January 31, 2017, C.D. and another student pushed each other while standing in the cafeteria.  Def.'s 56.1 Statement ¶ 51.

- On June 8, 2017, C.D. and other students were kicked by J.F. while watching a movie in class.  *Id.* ¶ 87.

- During fourth grade, N.T. called C.D. a "drugged Mickey Mouse."  *Id.* ¶ 103.

- Also during fourth grade G. and J. repeatedly accused C.D. of doing things he did not do in attempts to get him into trouble.  Pls.' 56.1 Statement ¶¶ 64, 72.

- On September 18, 2017, two students told C.D. to jump off a bridge.  Def.'s 56.1 Statement ¶ 111.

- In January 2019, L.S. attacked C.D. in the locker room after C.D. made a comment about L.S.'s girlfriend.  *Id.* ¶¶ 166, 168.

- In March 2019, outside of school, students invited C.D. to join the "house party" app and then left the chat room when C.D. joined.  *Id.* ¶ 173.

- In April 2019, outside of school, five students were invited, but did not show up to C.D.'s birthday party.  *Id.* ¶ 177.

- In January 2020 three students attempted to photograph C.D. while he was using the bathroom at school.  *Id.* ¶ 197.

- In February 2020, K. accused C.D. of having nude photos of a female student on his phone.  *Id.* ¶ 199.

- On March 6, 2020, an unnamed student physically assaulted C.D. for touching the other student's desk.  Pls.' 56.1 Statement ¶¶ 219-20; C.D. Aff. ¶¶ 47-48.

- At various points between third and fifth grade, C.D. felt that other children were mean to him on the playground, but no details about these incidents are provided.  Def.'s 56.1 Statement ¶¶ 16, 55, 107.

As multiple courts have explained, the Rehabilitation Act is not a "generalized anti-bullying statute," and without "some factual allegation linking" C.D.'s disabilities and the other students' conduct, there can be no Section 504 claim.  *Eskenazi-McGibney*, 84 F. Supp. 3d at 233; *see also Spring*, 2022 WL 1557053, at *13 (explaining that "middle school insults" like "butt buddy," and "slut," and one student's threats to kill another student, "are not disability-related" and therefore not actionable under the Rehabilitation Act).

On balance, and drawing all inferences in favor of Plaintiffs, Plaintiffs have adduced sufficient admissible evidence from which a reasonable jury could determine that C.D. was bullied and/or harassed due to his disabilities on numerous occasions, both by teachers and by peers, while a student in the District, but, at the same time, many of the alleged incidents cannot be part of Plaintiffs' Rehabilitation Act claim.

### 3.    Deliberate Indifference

To establish that the District was deliberately indifferent to incidents of harassment and bullying due to C.D.'s disabilities, Plaintiffs must show that "the [District] had actual knowledge of discrimination against [C.D.], had authority to correct the discrimination, and failed to respond adequately."  *See Loeffler*, 582 F.3d at 276; *see also K.M.*, 381 F. Supp. 2d at 359 (applying standard set forth by the Supreme Court in the Title IX context whereby "a school district can be held liable if it is deliberately indifferent to peer sexual harassment and its response is clearly unreasonable in light of the known circumstances" (quotation marks omitted)).  "The school's action—or inaction—must, 'at a minimum, cause students to undergo harassment or make them liable to or vulnerable to it.'"  *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 666 (2d Cir. 2012) (quoting *Davis*, 526 U.S. at 648).

a.  **Actual Knowledge**

There is little genuine dispute that the District had notice of the alleged disability-based

harassment and bullying that was directed at C.D., and Defendant offers only a cursory argument

that it lacked actual knowledge of C.D.'s experiences.  *See* Def.'s Mem. at 13.  In 2017, Mr. and

Mrs. Dale reported specific instances of bullying to the District and to C.D.'s teacher,

Grammerstorf.[17]  K. Dale Aff. ¶ 74.  Grammerstorf's communication log reflects that he was

aware that another child called C.D. "blind as a bat" and that he spoke to both children about the

incident.  Grammerstorf Log at 3.  Plaintiffs also wrote to the District to report generally on

bullying related to C.D.'s vision and motor issues.  For example, in February 2017, Mrs. Dale

sent an email to Garrison to "touch base" about C.D. and wrote:

> [C.D.] was sobbing last Thursday night, and did not want to go to school again on
> Friday . . . .  The kids were making fun of him for not seeing well at a game.  He
> basically smashed his face and broke his glasses on Tuesday so he was without
> them for two days.

Sussman Aff. Ex. 11.  In response, Garrison wrote, "[t]here were some concerns at recess.

[C.D.] told me about them and I informed [Benadi].  [Benadi] is addressing these concerns

tomorrow."  *Id.*  In June 2017, Mrs. Dale wrote a multi-page email to Castaldo, copying Benadi,

Grammerstorf, and an "AllBoardMembers" listserv, stating that over the past year, C.D. had

been "called things like: glasses, annoying, blind as a bat, the class faller, wanna be, girl . . . ."

Sussman Aff. Ex. 4 at 1-4.  Mr. Dale sent a similar email to "AllBoardMembers" in July 2017,

---

[17]  The fact that notice of bullying was provided to the District in certain instances by
Plaintiffs, who were not present for the actual incidents, rather than by C.D., is immaterial for
purposes of assessing whether the District had knowledge of the incidents.  "[A] parent's
testimony that she complained about a certain kind of bullying can suffice to create an issue of
fact regarding a school's notice."  *Spring*, 2022 WL 1557053, at *13 (citing *I.T. v. N.Y.C. Dep't
of Educ.*, No. 15-cv-3894 (WFK), 2020 U.S. Dist. LEXIS 133614, *18-21 (E.D.N.Y. July 14,
2020)).

and another email in September 2017, noting that C.D. "has not worn his glasses to school yet this year, as he fears he will be teased." *Id.* at 21, 24. On August 30, 2017, Plaintiffs' attorney wrote a letter to the District, referencing allegations of bullying similar to those set forth by Plaintiffs in their previous emails to District officials. *See* Sussman Aff. Ex. 3; Pls.' 56.1 Statement ¶ 127. Castaldo also testified that it had "probably" been reported to her by late March 2017 that students teased C.D. for falling. Castaldo Dep. at 49. A DASA Incident Report Form dated September 27, 2017 shows that C.D. reported that a student, J.F., said to him, "why don't you get your glasses back – you can't see!", which C.D. viewed as bullying behavior. Sussman Aff. Ex. 31.

During C.D.'s time at SMS, there is less evidence that C.D. and Plaintiffs brought disability-based bullying to the District's attention. With respect to specific reports of bullying, Mrs. Dale stated that, "[i]n December 2019 and January 2020, we continued to explain to district administrators that C.D. remained socially isolated and excluded from school activities because of the active hostility of other students who fastened upon his baggy clothing, necessary due to one of his disabilities, as a basis for taunting him." K. Dale Aff. ¶ 44. In their affidavits submitted in connection with their opposition, Plaintiffs state that they regularly reported bullying to the district, including bullying by N.T. *Id.* ¶¶ 41-44; A. Dale Aff. ¶ 2. Plaintiffs assert generally that they "continued to report bullying incidents to Danielle Castaldo," Pls.' 56.1 Statement ¶ 183, but make no reference of reporting disability-based bullying, and, when discussing specific reports, only discuss reporting instances unrelated to C.D.'s disabilities. For example, Plaintiffs reported to the District that another parent told them that their child no longer wanted to be friends with C.D., the off-campus incidents involving the "house party" app, and

the fallout from the *Journal News* article that was published about Mr. Dale.  *Id.* ¶¶ 172, 182,

199.  None of these complaints reference disability-based harassment.

Nevertheless, when viewed in the light most favorable to Plaintiffs, the examples in the

record of specific complaints going back to elementary school, and the specific references to

disabilities in at least one middle school complaint, are sufficient evidence for a reasonable jury

to conclude that the District had actual knowledge of disability-based harassment and bullying

behavior directed at C.D. in both elementary and middle school.

### b.  The District's Response

Finally, the District maintains that Plaintiffs cannot sustain their burden of showing that

the District acted with deliberate indifference because "whenever C.D. or Plaintiffs reported

specific incidents to the school . . . , building administrators and staff tried to resolve the issue."

Def.'s Mem. at 13.  Although victims of bullying and harassment "do not have a right to specific

remedial measures," *Zeno*, 702 F.3d at 666, "[d]eliberate indifference may be found both when

the defendant's response to known discrimination is clearly unreasonable in light of the known

circumstances, and when remedial action only follows after a lengthy and unjustified delay,"

*Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 751 (2d Cir. 2003) (cleaned up); *see also Zeno*, 702

F.3d at 669.  "Responses that are not reasonably calculated to end harassment are inadequate."

*Zeno*, 702 F.3d at 669; *see id.* at 670-71 (noting that the jury could have reasonably found that

the defendant's remedial actions "were little more than half-hearted measures" or that the

defendant "ignored the many signals that greater, more directed action was needed").  Here, with

respect to the peer-to-peer harassment only, Plaintiffs have presented evidence that could lead a

reasonable jury could conclude that the District failed to take adequate steps to address the

disability-based harassment and bullying of C.D.

### i.   Response to Teachers' Conduct

With respect to the two incidents involving C.D.'s teachers that could be viewed as discrimination due to C.D.'s disabilities, *see* Section B.2, *supra*, the District has established that it did not act with deliberate indifference.

After Pashley called C.D. a jerk in third grade, C.D. complained to DiPersio, the school principal at the time, who called a meeting with C.D., Pashley, and Plaintiffs to discuss what happened.  Def.'s 56.1 Statement ¶ 15; C.D. Dep. I at 44-45.  There is no dispute that this meeting took place, or that during the meeting, Pashley apologized to C.D.  *See* C.D. Dep. I at 44-45.  In advance of the following school year, Benadi contacted Pashley about the incident again and directed Pashley to read C.D.'s 504 plan carefully to ensure that Pashley fully understood C.D.'s needs.  Def.'s 56.1 Statement ¶¶ 29, 31.  With the exception of one incident the following year when Pashley raised his voice at C.D. to try to get C.D. to stop talking—an act which, as discussed in footnote 16, *supra*, did not constitute disability-based harassment— C.D. had no further issues with Pashley.  *See id.* ¶ 47.

Meanwhile, after the April 27, 2017 incident with McNally, Benadi directed McNally to contact Plaintiffs and to set up a meeting, which took place the following day.  *Id.* ¶¶ 72-74; 2016-17 Benadi Log at 5.  During this meeting, Benadi presented Plaintiffs with options to try to address C.D.'s issues with certain students and teachers, including the option of switching C.D. to a different class, which Plaintiffs declined.  Def.'s 56.1 Statement ¶¶ 76-78.  After this incident, the record is devoid of any further issues with McNally.

The District's response to each of these incidents does not remotely suggest that it failed to respond entirely, responded only after extreme delay, or acted in a manner that was not reasonably calculated to end any alleged harassment from these staff members based on C.D.'s

disability.  *See Zeno*, 702 F.3d at 666, 669.  Rather, in each instance, the District reacted

promptly to C.D.'s reports by holding meetings with C.D., his parents, and the teacher whose

actions were at issue, during which everyone discussed what happened and how best to address

the situations moving forward.  *Cf. Tesoriero v. Syosset Cent. Sch. Dist.*, 382 F. Supp. 2d 387,

399 (E.D.N.Y. 2005) ("The body of applicable case law indicates that a principal receiving

reports of possible teacher-to-student sexual harassment does not act with deliberate indifference

where he or she promptly investigates, institutes corrective measures, and subsequently

continues to monitor the situation.").  While Plaintiffs may have wanted the District to have

taken different or additional actions, they "do not have a right to specific remedial measures."

*Zeno*, 702 F.3d at 666; *Doe v. Torrington Bd. of Educ.*, 179 F. Supp. 3d 179, 194, 196 (D. Conn.

2016) (explaining that in both equal protection and Rehabilitation Act context, "[t]he 'deliberate

indifference' standard does not require a particular disciplinary action").

### ii.  Response to Peer Harassment Bullying

In contrast, Plaintiffs have presented sufficient evidence from which a reasonable jury

could conclude that the District acted with deliberate indifference with respect to the specified

instances of peer-to-peer bullying and harassment based on C.D.'s disabilities.  From C.D.'s time

in the Connor School, the District knew that Plaintiffs made numerous complaints about C.D.

being called named like "glasses," "blind as a bat," and "the class faller," Sussman Aff. Ex. 4 at

2-5, 17, 24, and that there were four specific students (N.T., J.F., G.L., and J.H) who tended to

give C.D. trouble, *see, e.g.*, Def.'s 56.1 Statement ¶ 84 (noting that the aide in Grammerstorf's

classroom was told to "keep an eye" on the interactions between these four students and C.D.);

Sussman Aff. Ex. 31 (9/27/2017 DASA form concerning C.D.'s claim that J.F. bullied him for

his poor eyesight).  According to C.D., one of those students continued to "relentlessly" bully

him in middle school on account of his disabilities, calling him names like "glasses," and making

fun of his balance issues and anxiety.  C.D. Dep. II at 149, 172.  C.D. spoke to Kagan about this

behavior, and Plaintiffs contacted the District about this and other instances in which students

taunted C.D. for the clothes he wore due to his neuro-developmental disorder.  *See* Kagan Dep.

at 23-24, 45-46; C.D. Dep. II at 162-68; K. Dale Aff. ¶ 44.  Nevertheless, the District has not

pointed to any evidence that it took any particular measures to address this behavior at SMS.

While the District has presented some evidence of actions taken in 2017 in response to

specific complaints of bullying at the Connor School, *see* Grammerstorf Log at 3; 2016-17

Benadi Log at 2-5; 2017-18 Benadi Log at 8-9, the evidence shows that the bullying continued

into middle school.  In less than two years at SMS, C.D. dropped out of extracurricular activities,

frequently missed school, attempted suicide, and, eventually, transferred out of the District.  A

reasonable jury therefore could infer that the measures taken by the District in elementary school

were inadequate, and that the District's response as a whole to the multiple instances of peer-to-

peer harassment and bullying amounted to "little more than half-hearted measures" or that the

District "ignored the many signals that greater, more directed action was needed."  *Zeno*, 702

F.3d at 669-71 (holding jury was entitled to find that "[a]t some point after [student's] first

semester, the [d]istrict should have done more, and its failure to do more 'effectively caused'

further harassment"); *see Wills v. Brown Univ.*, 184 F.3d 20, 26 (1st Cir. 1999) (in Title IX

context, "evidence of an inadequate response is pertinent to show fault and causation where the

plaintiff is claiming that she was harassed or continued to be harassed after the inadequate

response").

\* \* \* \* \* \* \* \* \* \*

In sum, the Court finds that there are triable issues of fact precluding an award of

summary judgment on Plaintiff's Section 504 claim.  A reasonable jury, looking at the evidence

discussed above, could conclude that C.D. was subjected to severe and pervasive peer harassment and bullying due to his disabilities, that this harassment and bullying was known to teachers and administrators in the District, that the District's response to the harassment and bullying amounted to deliberate indifference, and that C.D. was thereby excluded from participation in the District's services and programs.  *See K.M.*, 381 F. Supp. 2d at 360-61.  The District's motion for summary judgment as to Plaintiffs' Section 504 claim is therefore GRANTED IN PART AND DENIED IN PART.  Plaintiffs' claim may proceed on the limited basis detailed above.

### C.    Negligent Supervision

The District also contends that it is entitled to summary judgment on Plaintiffs' New York State law claim for negligent supervision.  Def.'s Mem. at 15-19.  But because the District does not engage with the claim as it is specifically alleged in the Amended Complaint, *see* Am. Compl. ¶¶ 218-23, summary judgment is not warranted on this cause of action.

As set forth in the Amended Complaint, Plaintiffs' claim for negligent supervision is focused on the 2016-2017 school year when, Plaintiffs allege, they "sought the intervention of Deputy Superintendent Steven Walker because [Benadi] had been unresponsive to their reports of bullying and behaved in a manner partial to other students and their families."  *Id.* ¶ 218. Specifically, Plaintiffs allege that Benadi "repeatedly failed to complete or insure the completion of DASA forms chronicling the bullying to which C.D. was subjected in her school or to implement measures, including appropriate discipline of other students and staff, calculated to insure C.D. was provided and safe and bullying-free educational environment."  *Id.* ¶ 219. Plaintiffs go on to allege that "*[b]y failing to properly supervise [Benadi]*, defendant [D]istrict acted in a negligent manner and refused and compounded her failure to implement the legal

protections state and federal law provided for C.D. as a victim o[f] bullying or assure C.D. an educational environment safe from pervasive bullying." *Id.* ¶ 223 (emphasis added).  Defendant did not address these allegations in its arguments regarding Plaintiffs' negligent supervision claim; accordingly, Defendant has not moved for summary judgment at least as to this aspect of the claim, and therefore at least this portion of the claim must remain part of the case.

The District does argue, however, that the record does not support a negligent supervision claim premised on the school's failure to supervise C.D.  *See* Def.'s Mem. at 15-19 ("[T]he District has established it provided C.D. with adequate supervision; Plaintiffs cannot raise a triable issue of fact on this issue."); Def.'s Reply at 14 ("Plaintiffs' negligent supervision claim fails because, when applying the reasonably prudent parent standard to the circumstances, the District provided C.D. with adequate supervision.").  Plaintiffs respond to this argument, but do not highlight the District's apparent disregard of Plaintiffs' specific allegations as to this cause of action.  *See* Pls.' Opp. at 17-18.

As to the theory of negligent supervision that actually was discussed in the parties' papers, the Court will require clarification as to whether this theory is actually pled in the Amended Complaint, and if so, whether this aspect of the claim encompasses only the incidents that could reasonably serve as the basis of Plaintiffs' claim of disability discrimination, or whether it is intended to capture a broader range of conduct.  The Court will likely require additional short submissions from the parties in light of this decision, and the parties should be prepared to discuss this issue in greater detail at the next conference with the Court.

D.      **Spoliation Sanctions**

Finally, the District moves for spoliation sanctions based on Plaintiffs' failure to preserve

journals that C.D. kept during periods of time relevant to this litigation.  Def.'s Mem. at 19.  The

Court agrees that Plaintiffs have spoliated relevant evidence and that some sanction is warranted.

"Spoliation is the destruction or significant alteration of evidence, or the failure to

preserve property for another's use as evidence in pending or reasonably foreseeable litigation."

*West v. Goodyear Tire & Rubber Co*., 167 F.3d 776, 779 (2d Cir. 1999).  The Second Circuit has

instructed that "[t]he obligation to preserve evidence arises when the party has notice that the

evidence is relevant to litigation or when a party should have known that the evidence may be

relevant to future litigation."  *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 436 (2d Cir.

2001).  Pursuant to this obligation, "anyone who anticipates being a party or is a party to a

lawsuit must not destroy unique, relevant evidence that might be useful to an adversary."

*Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 217 (S.D.N.Y. 2003) ("*Zubulake IV*"); *see also*

*Raymond v. City of New York*, No. 15-cv-6885 (LTS) (SLC), 2020 WL 7055572, at *6 (S.D.N.Y.

Dec. 2, 2020) (quoting *Zubulake IV*, 220 F.R.D. at 216-17).

"Where a movant seeks sanctions based on the destruction or loss of evidence, it must

demonstrate that the sought-after evidence actually existed before spoliation."  *Kosmidis v. Port*

*Auth. of N.Y. & N.J.*, No. 18-cv-8413 (AJN) (RWL), 2020 WL 5754605, at *4 (S.D.N.Y. Aug.

27, 2020) (quotation marks omitted), *adopted by* 2020 WL 7022479 (S.D.N.Y. Nov. 30, 2020).

"The burden is on the moving party to prove the elements of a spoliation claim by a

preponderance of the evidence."  *Id.*  These elements are "(1) that the party having control over

the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records

were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to

the party's claim or defense such that a reasonable trier of fact could find that it would support

that claim or defense." *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 162 (2d Cir. 2012)

(quotation marks omitted).  If sanctions are warranted, district courts have broad discretion in

"crafting a proper sanction for spoliation."  *West*, 167 F.3d at 779; *see also Fujitsu*, 247 F.3d at

436 ("The determination of an appropriate sanction for spoliation, if any, is confined to the

sound discretion of the trial judge.").  "The sanction should be designed to: (1) deter parties from

engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully

created the risk; and (3) restore the prejudiced party to the same position he would have been in

absent the wrongful destruction of evidence by the opposing party."  *West*, 167 F.3d at 779

(quotation marks omitted).

### 1.     Obligation to Preserve Evidence

As a threshold matter, there is no dispute that the two journals that are the subject of

Defendant's spoliation motion—one from C.D.'s fifth grade school year and one from the

summer before middle school and his time at SMS—existed.  Indeed, C.D. testified that he

"threw out" all of his journals, and in particular that he threw out his fifth grade journal when he

was at Cherry Lane, and threw out his middle school journal sometime after he had enrolled at

Barnstable Academy in the spring of 2020.  C.D. Dep. II at 63-64, 73-74, 76, 79.

The District must next demonstrate that Plaintiffs had a duty to preserve C.D.'s journals.

This involves "two related inquiries: *when* does the duty to preserve attach, and *what* evidence

must be preserved?"  *Zubulake IV*, 220 F.R.D. at 216.  "The duty to preserve can arise even

before formal initiation of an action, once a party reasonably anticipates litigation."  *Kosmidis*,

2020 WL 5754605, at *4 (cleaned up).  Here, Plaintiffs served a notice of claim on the District

on December 29, 2017, *see* Am. Compl. ¶ 12, and this action was initiated on May 18, 2018, *see*

ECF No. 1.  Plaintiffs' duty to preserve relevant evidence therefore arose no later than December 29, 2017.  *See Hughes v. City of New York*, No. 18-cv-9380 (MKV), 2021 WL 4295209, at *9 (S.D.N.Y. Sept. 21, 2021) ("Defendants' duty to preserve the photographs and radio transmissions arose on January 8, 2018, when Plaintiff served his Notice of Claim.").  Based on this timing, the record is unclear as to whether C.D.'s fifth grade journal was spoliated, given that C.D. was unsure when exactly he discarded it after transferring to Cherry Lane.  *See* C.D. Dep. II at 74.  Because of this ambiguity, it would not be appropriate to impose sanctions in connection with the discarding of C.D.'s fifth grade journal.  The record is clear, however, that C.D. discarded his middle school journal at some point after the spring of 2020, well after the preservation obligation arose in December 2017.

The next issue is whether C.D.'s middle school journal was relevant to this action.  "In this respect, 'relevance' means relevance for purposes of discovery, which is an extremely broad concept."  *Orbit One Commc'ns, Inc. v. Numerex Corp.*, 271 F.R.D. 429, 436 (S.D.N.Y. 2010) (quotation marks omitted).  The answer to that question is undeniably yes.  This litigation arises out of allegations that C.D. was bullied and harassed at school over a period of five years between 2015 and 2020.  *See* ECF No. 1; Am. Compl.  According to C.D., he kept a journal to write "about [his] experiences whenever [he] felt sad"; about how he "felt unhappy going to school every single day"; about his "anxiety about going into the middle school"; and about specific incidents that occurred at school.  C.D. Dep. II at 68-70, 76-77.  C.D. began writing journals in January 2017, when he was in fourth grade, and wrote in them regularly until he transferred to Barnstable in 2020.  *Id.* at 64, 74, 76, 79.  There is no question that C.D.'s recollections and feelings surrounding various incidents that occurred while he was a student in the District are at the heart of this litigation, and accordingly Plaintiffs had a duty to preserve

C.D.'s middle school journal.  *See Zubulake IV*, 220 F.R.D. at 218 (finding that the duty to

preserve extends to any documents or tangible things that are considered relevant under Rule 26

of the Federal Rules of Civil Procedure).

### 2. Culpable State of Mind

The second question is whether Plaintiffs had a sufficiently culpable state of mind when

the middle school journal was destroyed to warrant sanctions.  *See Curcio v. Roosevelt Union*

*Free Sch. Dist.*, 283 F.R.D. 102, 111 (E.D.N.Y. 2012) ("Even where the preservation obligation

has been breached, sanctions will only be warranted if the party responsible for the loss had a

sufficiently culpable state of mind." (quotation marks omitted)).  "In this [C]ircuit, a 'culpable

state of mind' for purposes of a spoliation inference includes ordinary negligence.  When

evidence is destroyed in bad faith (*i.e.*, intentionally or willfully), that fact alone is sufficient to

demonstrate relevance."  *Zubulake IV*, 220 F.R.D. at 220 (citations omitted).  "By contrast, when

the destruction is negligent, grossly negligent, or reckless, relevance must be proven by the party

seeking sanctions."  *Passlogix, Inc. v. 2FA Tech., LLC*, 708 F. Supp. 2d 378, 411 (S.D.N.Y.

2010) (citing *Zubulake IV*, 220 F.R.D. at 221).  "Once the duty to preserve attaches, any

destruction of documents is, at a minimum, negligent."  *Zubulake IV*, 220 F.R.D. at 220.

In some instances, negligence is sufficient to warrant sanctions "because each party

should bear the risk of its own negligence."  *Residential Funding Corp. v. DeGeorge Fin. Corp.*,

306 F.3d 99, 108 (2d Cir. 2002).  "A party is negligent even if the failure results from a pure

heart and an empty head."  *Curcio*, 283 F.R.D. at 111 (quotation marks omitted).  Accordingly,

"[i]t follows that gross negligence also satisfies the culpability requirement."  *Sekisui Am. Corp.*

*v. Hart*, 945 F. Supp. 2d 494, 503 (S.D.N.Y. 2013).  "This [C]ircuit follows a 'case-by-case

approach to the failure to produce relevant evidence' because 'such failures occur along a

continuum of fault—ranging from innocence through the degrees of negligence to intentionality.'"  *Id.* at 503-04 (quoting *Residential Funding*, 306 F.3d at 108).

Here, the record is clear that Plaintiffs were aware of their obligation to preserve relevant documents after they initiated this litigation.  *See* K. Dale Dep. II at 386-88; Sokoloff Decl. Ex. I ("A. Dale Dep.") at 236.  Mr. and Mrs. Dale also knew that C.D. kept journals and, indeed, encouraged him to write in them as a "vehicle . . . to express himself."  K. Dale Aff. ¶ 49; *see also* C.D. Dep. II at 65, 82.  Plaintiffs maintain, however, that they "did not realize providing such a personal journal was part of [their] discovery obligation," particularly since they did not read C.D.'s journals and did not specifically know what they contained.  *See* K. Dale Aff. ¶ 49. This explanation is unavailing.  There is no question that Plaintiffs should have identified C.D.'s middle school journal as a potential source of evidence, and should have taken greater care to collect and preserve that item.  That said, from the evidence presented, there is no basis to conclude that either C.D. or Plaintiffs acted with the intent to deprive Defendant of access to the journal for use as evidence in this litigation.

Based on this record, given Plaintiffs' knowledge of the journal and its purpose, and C.D.'s central role in this litigation, and considering the "continuum of fault—ranging from innocence through the degrees of negligence to intentionality," *Residential Funding*, 306 F.3d at 108 (quotation marks omitted), the Court finds that Plaintiffs' conduct with respect to the failure to preserve C.D.'s middle school journal falls somewhere between negligent and grossly negligent, *see F.D.I.C. v. Horn*, No. 12-cv-5958 (DRH) (AKT), 2015 WL 1529824, at *12-13 (E.D.N.Y. Mar. 31, 2015) (finding defendant's actions fell "somewhere between negligence and gross negligence, closer to the latter than the former" where individual defendant "deliberately discarded his computer hardware, even though he did not do so with the intention of destroying

potentially relevant ESI" ).  Accordingly, the District must demonstrate the relevance of the

middle school journal in order for sanctions to be warranted.

### 3.    Relevance

When the spoliating party acts negligently, the movant must demonstrate that "the

spoliated evidence was relevant to its claims or defenses, such that a reasonable trier of fact

could find that it would support those claims or defenses."  *Adorno v. Port Auth. of N.Y. & N.J.*,

258 F.R.D. 217, 227 (S.D.N.Y. 2009); *see also Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422,

431 (S.D.N.Y. 2004) ("*Zubulake V*") ("[T]he concept of relevance encompasses not only the

ordinary meaning of the term, but also that the destroyed evidence would have been favorable to

the movant." (cleaned up)).

While there can be no dispute that C.D.'s journal would have been relevant according to

"the ordinary meaning of the term," the District has not established that it "would have been

favorable" to the District's defenses.  *See Zubulake V*, 229 F.R.D. at 431.  "Although the burden

placed on the moving party to show that the lost evidence would have been favorable to it ought

not be too onerous, when the culpable party was negligent, there must be extrinsic evidence to

demonstrate that the destroyed evidence was relevant and would have been unfavorable to the

destroying party."  *Adorno*, 258 F.R.D. at 229 (cleaned up); *accord Hughes*, 2021 WL 4295209,

at *13 ("Yet, a court must have some evidence regarding the particular nature of the missing

[evidence] in order to evaluate the prejudice it is being requested to mitigate." (quotation marks

omitted)).

The District asserts simply that the journal was "relevant to the claims or defenses in this

litigation as C.D. admits he wrote in his journals about his negative experiences in school."

Def.'s Mem. at 24.  But Defendant has failed to show that the middle school journal would

support *the District's* position in this litigation, *see Zubulake V*, 229 F.R.D. at 431, and the more logical inference is that the journal of a child, used as a tool to regularly express and record his emotions and frustrations, would tend to enhance Plaintiffs' claims rather than the District's defenses.  Based on the record before the Court, the District has not shown that the middle school journal would have been unfavorable to Plaintiffs, and thus, the more extreme spoliation sanctions requested by the District—such as barring Plaintiffs from opposing the instant motion, and precluding any evidence Plaintiffs seek to introduce at trial about events that took place while C.D. kept journals and how those events made C.D. feel—are not appropriate.[18]

### 4. Appropriate Sanctions

The Court nevertheless concludes certain sanctions are appropriate here.  "In situations where the spoliating party acted with the requisite culpable state of mind but did not prejudice the party seeking sanctions, courts are directed to consider lesser sanctions, including awarding the costs of making the motion for sanctions."  *Curcio*, 283 F.R.D. at 114 (citing *Residential Funding*, 306 F.3d at 112).  Because Plaintiffs acted with at least negligence in failing to comply with their obligation to preserve C.D.'s middle school journal, the Court finds that a monetary sanction is warranted.  The amount of the sanction will be equal to the reasonable costs the

---

[18] The Court rejects Plaintiffs' argument that the District has "unclean hands" in making this spoliation motion.  *See* Pls.' Opp. at 19.  According to Plaintiffs, Superintendent Adams testified that he maintained binders with information relevant to this case that were never reviewed or produced to Plaintiffs.  *Id.*  Importantly, Plaintiffs fail to assert that they requested those binders be produced after Adams's deposition, and tellingly concede that "it is not known whether his records have been destroyed"—in other words, Plaintiffs appear not to have made any specific further inquiries regarding the materials.  *See id.*; *see also* Sussman Aff. Ex. 13 ("Adams Dep.") at 138 (showing no information and/or documents requested in connection with deposition) & Ex. 29 (extensive follow-up document requests, sent months after the Adams deposition, which do not make any specific request for the binders referenced during that deposition).  And in any event, Plaintiffs' arguments about the District's alleged discovery conduct do not in any way refute the arguments offered by the District regarding the spoliation of C.D.'s middle school journal.

District incurred in making the motion for spoliation sanctions, including reasonable attorneys' fees.  *See CAT3, LLC v. Black Lineage, Inc.*, 164 F. Supp. 3d 488, 502 (S.D.N.Y. 2016) (spoliating party was required to "bear the costs, including reasonable attorneys' fees, incurred by the defendants in establishing the plaintiffs' misconduct and in securing relief.  This remedy ameliorates the economic prejudice imposed on the defendants and also serves as a deterrent to future spoliation.").  Counsel for Defendant is hereby directed to provide Plaintiffs' counsel with a breakdown of the requested amount of fees and expenses associated with briefing the sanctions motion.  If Plaintiffs do not agree as to the amounts included, they must send a responsive letter within one week setting forth their position.  If the parties are not able to resolve this issue on their own, they must contact the Court promptly to address any disputes.

　　　　In addition, some degree of evidentiary limitations will be necessary at trial.  At a minimum, no witness for the Plaintiffs will be permitted to make reference during trial testimony to any journal that C.D. kept.  *See West*, 126 F.3d at 780 (explaining that trial court may "preclude [a spoliating party] from offering evidence" on issues related to spoliated materials); *cf. Lokai Holdings LLC v. Twin Tiger USA LLC*, No. 15-cv-9363 (ALC) (DF), 2018 WL 1512055, at *17 (S.D.N.Y. Mar. 12, 2018) (precluding a spoliating party, pursuant to Rule 37(e)(1), "from offering testimony at trial as to the content of any unpreserved [materials] . . . including any testimony suggesting that such [materials] would have supported any elements of their defenses or counterclaims").  Other potential narrow limitations on the scope of testimony can be addressed via pretrial motions *in limine.  See Luna v. Am. Airlines*, 676 F. Supp. 2d 192, 202 (S.D.N.Y. 2009) ("As for the nature of the remedy if spoliation is found, the court has broad discretion but should 'tailor sanctions to insure that spoliators do not benefit from their wrongdoing—a remedial purpose that is best adjusted according to the facts and evidentiary

posture of each case.'" (quoting *Reilly v. NatWest Mkts. Grp.*, 181 F.3d 253, 267 (2d Cir. 1999)). The District's request that the Court impose other, more stringent sanctions, *see* Def.'s Mem. at 24-25, is denied.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment (ECF No. 76) is GRANTED IN PART AND DENIED IN PART, and Defendant's motion for sanctions (also ECF No. 76) is GRANTED IN PART AND DENIED IN PART.

An in-person status conference is hereby scheduled for October 13, 2023 at 10:30 a.m. in Courtroom 250 in the White Plains federal courthouse. In advance of the conference, counsel must meet and confer to discuss (i) an abbreviated schedule for any additional submissions regarding the negligent supervision claim; (ii) the parties' willingness to engage in further alternative dispute resolution efforts; and (iii) potential trial dates between January and April 2024.

Dated: September 28, 2023
      White Plains, New York

                                      **SO ORDERED.**

                                        _____

                                        ANDREW E. KRAUSE
                                        United States Magistrate Judge